IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JORDAN GRIFFIN and CHERYL PERDUE, | ) ) | Civ. No. 08-00242 ACK-LEK |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JTSI, INC., UNITED STATES, and DOE DEFENDANTS 2-10, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

ORDER DENYING DEFENDANT JTSI'S MOTION FOR SUMMARY JUDGMENT

PROCEDURAL BACKGROUND

On March 18, 2008, Plaintiffs Jordan Griffin ("Plaintiff Griffin") and Cheryl Perdue ("Plaintiff Perdue") (collectively, "Plaintiffs") filed a First Amended Complaint ("Complaint") against JTSI, Inc. ("Defendant JTSI"), Lee Hayashi ("Mr. Hayashi"), and Doe Defendants 2-10, in the Circuit Court of the First Circuit, State of Hawaii.  The Complaint alleges a violation of the Hawaii Whistleblowers' Protection Act, H.R.S. § 378-62 ("Count I"), and wrongful termination in violation of public policy ("Count II").[1/] Complaint at ¶¶ 42-47.

_____

[1/] The Complaint also alleges three additional Counts as to Mr. Hayashi: (1) intentional infliction of emotional distress, (2) negligent infliction of emotional distress, and (3) interference with prospective economic advantage.  See Complaint at ¶¶ 48-54.  The First Circuit Court disposed of all additional claims against Defendant JTSI, but denied Motions for Summary Judgement as to Counts I and II.  See Motion at 12.  Therefore,

On May 23, 2008, Mr. Hayashi filed a Notice of Removal in this Court.  The Notice of Removal substituted the United States of America as Defendant in place of Mr. Hayashi. Defendant United States of America ("Defendant United States") submitted notice of such substitution on July 25, 2008.

On June 13, 2008, Defendant JTSI filed the instant Motion for Summary Judgment ("Motion") against Plaintiffs on Counts I and II of the Complaint.  Defendant JTSI attached the affidavit of H.K. Bruss Keppeler ("Keppeler Affidavit"), the Vice-President and General Counsel for Defendant JTSI, which authenticates Exhibits A-L as true and correct copies of the original documents.  Defendant JTSI also attached the affidavit of its attorney Terry E. Thomason ("Thomason Affidavit"), which authenticates Exhibits M-Q as true and correct copies of the original documents.  On the same day, Defendant JTSI filed a Separate Concise Statement of Facts in Support of Motion for Summary Judgment ("Motion CSF").  On September 26, 2008, Plaintiffs filed a Memorandum in Opposition to Defendant JTSI's Motion for Summary Judgement ("Opposition").  Plaintiffs attached the declaration of their attorney, Robin Melchor ("Melchor Decl."), authenticating Exhibits 1-4 as true and correct copies of the original documents.  Plaintiffs also filed a Concise

---

Defendant JTSI's present Motion for Summary Judgment before this Court only addresses Counts I and II.  <u>See</u> Motion at 2.

Statement of Facts in Opposition to Defendant JTSI's Motion for Summary Judgment ("Opposition CSF").  Within the Opposition, Plaintiffs requested the Court deny the Motion or continue the action to permit discovery under Fed. R. Civ. P. 56(f).  Opposition at 16.

On September 26, 2008, Defendant United States filed a Statement of No Opposition to the Motion.

On October 3, 2008, Defendant JTSI filed a Reply Memorandum in Support of its Motion for Summary Judgment ("Reply"), along with a Reply Concise Statement of Facts ("Reply CSF").

The Court held a hearing on the Motion on October 16, 2008.  Subsequent to the hearing and with the approval of all parties, the Court reviewed in camera the Prime Contract between Science Applications International, Corp., and the United States.

## FACTUAL BACKGROUND[2/]

Defendant JTSI is a subcontractor to Science Applications International, Corp. ("SAIC"), a contractor to a prime contract with the United States government ("Prime Contract").  Motion CSF at ¶ 1; Keppeler Affidavit at ¶ 4.  Under the Subcontract between Defendant JTSI and SAIC ("Subcontract"),

---

[2/] The facts as recited in this Order are for the purpose of disposing of this motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

Defendant JTSI's obligations included providing security personnel for the Visitor Control Center ("VCC") of the Nimitz-MacArthur Command Center, United States Pacific Command ("USPACOM"), Camp H.M. Smith, Hawaii.  Id.  Specifically, JTSI personnel supported the United States by providing access control, monitoring security cameras, and issuing clearance badges.  Motion CSF at ¶ 1; Motion Exh. A, Tab 1 at 1.

The government retained the authority to control most aspects of Defendant JTSI's performance under the Subcontract. Although JTSI provided the personnel, the government established the procedures that the JTSI personnel were to follow in performing their security duties at the VCC.[3/]  Motion Exh. A, Tab 1 at 1.  Mr. Hayashi was the government official representing Defendant United States as the Physical Security Officer at the VCC.  Keppeler Affidavit at ¶ 10.  Further, the Subcontract incorporated Federal Acquisition Regulation ("FAR") clause 52.246-6, 48 C.F.R. § 52.246-6, into the Subcontract.  Motion Exhibit A, Tab 2 at 2, 6.  FAR clause 52.246-6 generally allows the government to inspect all materials furnished and services

_____

[3/] The Statement of Work ("SOW") of the Subcontract states that "[p]olicies and procedures [for the VCC] shall be established by the government for implementation by the contractor."  Motion Exh. A, Tab 1 at 1.  Defendant JTSI contends that the government had "exclusive discretion and authority" under the Subcontract.  Motion CSF at ¶ 3.  Plaintiffs, however, contend that nothing in the Subcontract specifically gives the government exclusive discretion and authority.  Opposition CSF at ¶ 3.

performed under the Subcontract, and reserves in the government the right to require replacement or correction of services rendered or materials delivered.[4]  Motion CSF at ¶ 2; 48 C.F.R. § 52.246-6.  The Subcontract also reserved in SAIC "the right to direct the removal of any individual assigned to this Subcontract."  Motion Exh. A at 4.

In January of 2005, prior to the hiring of Plaintiffs, the government implemented heightened procedures and required all VCC personnel to obtain a Top Secret Security clearance. Opposition Exhs. 3, 4.

Plaintiffs both worked as security personnel for Defendant JTSI at the VCC from 2004-2005.  See Complaint at ¶¶ 7-29.  Plaintiff Griffin began employment at the VCC on October 11, 2004 and Plaintiff Perdue began employment on July 19, 2004. Complaint at ¶¶ 7-8.  Defendant JTSI employed Plaintiffs at-will. See Motion Exhs. D, E.

Sometime before February 10, 2005, Plaintiff Perdue contacted Ginger Jacobs, Defendant JTSI's Human Resource Manager,

---

[4] Plaintiffs contend and the Court notes that FAR clause 52.246-6 deals with materials delivered and services rendered and that there is no language stating that the government has control over who is hired and fired under the Subcontract.  Opposition CSF at ¶ 2.  Defendant JTSI counters by arguing that it has never alleged that the Subcontract allows the government to decide who Defendant JTSI hires or fires.  Reply CSF at ¶ 2.  Instead, Defendant JTSI argues that in order to correct services, the United States may request the removal of employees under the Subcontract.  Reply at 4.

to report a potential security violation at the VCC by Faith
Tominaga, one of Plaintiff Perdue's co-workers.  Motion Exhs. O
at 9, F at 1-2; see also Opposition Exh. 1 at ¶ 4.  Plaintiff
Perdue reported that Faith Tominaga was allowing her boyfriend,
Sam Baker, allegedly a convicted felon, to enter the VCC without
clearance and remain there for Ms. Tominaga's entire shift of
work.  Id.  In response, Ms. Jacobs told Plaintiff Perdue that
she would follow up by looking into the issue.  Motion CSF at ¶
7; Motion Exh. G at 1.

On March 19, 2005[5/], Plaintiff Perdue also contacted
Heather Payne, the assistant security officer at the VCC under
Mr. Hayashi, regarding the situation with Ms. Tominaga, Mr.
Baker, and other work-related concerns.  Opposition Exh. 1 at ¶
11; Motion Exh. H.  Defendant JTSI contends that Officer Payne
simply never responded to Plaintiff Perdue, while Plaintiffs
assert that although Ms. Payne was very concerned about the
situation, she just never got back to Plaintiffs directly
regarding the matter.  Motion CSF at ¶ 8; Opposition CSF at ¶ 8.

On or about March 24, 2005, Plaintiff Perdue viewed a
copy of a video surveillance tape depicting Mr. Baker in the VCC

_____

[5/] Plaintiff Perdue's declaration states that her
conversation with Ms. Payne occurred on or about March 25, 2005.
Opposition Exh. 1 at ¶ 11.  However, Plaintiff Perdue stated that
this conversation occurred March 19, 2005 in both her answers to
interrogatories and within the copy of the statement that
Plaintiff Perdue left with Ms. Payne that day.  See Motion Exh. O
at 9-10; Motion Exh. H at 1.

using a computer with access to confidential information. Opposition Exh. 1 at ¶ 7. The video also showed Mr. Baker and several other friends of Ms. Tominaga in the VCC without clearance or escort. Id. at ¶ 8. On March 25, 2005, Plaintiff Perdue showed the video to Plaintiff Griffin, and Plaintiff Griffin agreed that Ms. Tominaga and Mr. Baker were committing security violations. Id. at ¶¶ 9-10. On that day or before, Plaintiff Griffin also informed Plaintiff Perdue that he had seen Mr. Baker using the VCC security computers in the past, and that there had been recent accesses on Mr. Baker's badge, which Mr. Baker was not allegedly authorized to have. Motion Exh. H at 1.

On March 24 or 25, 2005, Plaintiff Perdue contacted Dana Oania[6/], Ms. Jacobs replacement as Defendant JTSI's human resource manager, and spoke to her on the phone regarding what Plaintiffs had seen on the video. Motion CSF at ¶ 9; Motion Exh. O at 10. Ms. Oania stated that she was not sure how to handle the problem, but in the meantime, Plaintiffs and a third JTSI employee, Travis Goodwin arranged a meeting with Ms. Oania on

---

[6/] Defendant JTSI states that Plaintiff Perdue either contacted Ms. Jacobs or Ms. Oania. Motion CSF at ¶ 9. Plaintiffs, however, state that the conversation on this date was with Ms. Oania, as she had replaced Ms. Jacobs by this point. For the purposes of this Motion, the Court simply recognizes that the human resource manager for Defendant JTSI was contacted on this date.

April 1, 2005 to discuss the security issues.[7/]  Motion Exh. O at 10; Motion CSF at ¶ 10.

Sometime around March 25, 2005, Plaintiff Griffin, along with Mr. Goodwin, met with Ms. Payne to show her the videotape and discuss the security concerns.  Motion Exh. M at 59:1-9; Motion CSF at ¶ 11.  Ms. Payne responded by stating that Mr. Hayashi would set up a meeting with all the VCC personnel. Id.

On March 29, 2005, Mr. Hayashi, along with Ron Jarrett, the vice president for Defendant JTSI, met with all the VCC personnel.  Motion CSF at ¶ 14; Opposition Exh. 1 at ¶¶ 13-15; Motion Exh. O at 10.  In the meeting, Mr. Hayashi did not allow anyone to speak and he explained that he was aware of the security violation.  Id.  Defendant JTSI contends that Mr. Hayashi explained that it was alright for VCC personnel to bring family members into the VCC on their shifts, but that allowing anyone to use the computers was impermissible.  Motion CSF at ¶ 14.  Plaintiffs contend that Mr. Hayashi also stated he was not going to do anything about the violations, and further threatened all the VCC personnel by saying that he could have their security

---

[7/] Defendant JTSI states that the meeting was set to specifically discuss Ms. Tominaga's conduct.  Motion CSF at ¶ 10. Plaintiffs dispute this characterization, and state that the purpose of the meeting was "to discuss the security breach and to follow up with their complaints."  Opposition CSF at ¶ 10.  The Court finds no material distinction between these characterizations.

clearances revoked, that this job is not for everyone, and that if they did not comply, they should seek employment elsewhere.[8/] Opposition CSF at ¶ 14; Opposition Exhs. 1 at ¶¶ 14-15, 2 at 67:2-12; Motion Exhs. M at 62:9-15, N at 89:12-16.

Dissatisfied with Mr. Hayashi's statements, Plaintiffs, along with Mr. Goodwin, approached Mr. Jarrett after the meeting, expressing their concerns to him and explaining the contents of the video.  Motion CSF at ¶ 17; Opposition Exh. 1 at ¶ 16; Motion Exh. O at 10-11.  Mr. Jarrett responded by stating that Defendant JTSI's responsibility was simply to report the matter to the United States.[9/]  Motion Exh. Q at 66:14-16.  Plaintiffs contend that Mr. Jarrett was generally disinterested with their concerns. Motion Exhs. N at 90:16-24, 167:1-3, M at 64:8-12.

_____

[8/] Defendant JTSI argues that Mr. Hayashi's decision conformed to USPACOM's internal visitor policy.  Motion CSF at ¶ 16; Motion Exh. Q at 43:7-24.  Plaintiff disputes this fact and argues just the opposite: that the decision did not conform to USPACOM's visitor policy because the policy applied to military officers and not the VCC personnel, that the policy generally required prearrangement of visitors, and that as of January 2005, the VCC had increased its security level to top secret security status.  Opposition CSF at ¶ 16; Motion Exh. Q at 43:7-24; Opposition Exhs. 3, 4.

[9/] Defendant JTSI contends that Mr. Jarrett informed Plaintiffs and Mr. Goodwin that the United States has exclusive authority to decide potential security issues.  Motion CSF at ¶ 17.  Plaintiffs, however, contend that Mr. Jarrett never gave this explanation.  Opposition CSF at ¶ 17.  Both parties interpret differently a statement from Mr. Jarrett's deposition, where Mr. Jarrett recalled telling Plaintiffs and Mr. Goodwin that "[i]t is [JTSI's] duty to report, and it's the United States' duty to decide [what further action to take]."  Motion Exh. Q at 66:14-16.

Feeling their concerns were falling on deaf ears, Plaintiffs continued to report the alleged security violations of Ms. Tominaga and Mr. Baker to several other security officials. On March 30, 2005, Plaintiff Perdue reported the alleged security violations to the Army Criminal Investigations Division's 1st Sergeant Ahn.  Opposition Exh. 1 at ¶¶ 18-21; Motion CSF at ¶ 20; Motion Exh. O at 11.  Sergeant Ahn referred the matter to Kenny Wheeler of the Naval Criminal Investigative Service ("NCIS") because the VCC is part of a Navy installation.  Id.  Plaintiff Perdue then spoke directly with Mr. Wheeler about the matter. Id.  Mr. Wheeler stated that the situation was under the jurisdiction of the Provost Marshal Office ("PMO"), and referred the matter specifically to Guy Dunan of the USPACOM Security Office.  Id.  Plaintiff Perdue spoke with Mr. Dunan on March 31, 2005 and expressed her concern that Mr. Hayashi was not going to do anything about the security issue.  Motion CSF at ¶¶ 23-24. Plaintiffs allege that Mr. Dunan replied that he did not want to discuss the matter.[10/]  Opposition Exh. 1 at ¶ 24; Motion Exh. O at 11.

---

[10/] Plaintiffs further allege that Plaintiff Perdue was upset that the case was assigned to Mr. Dunan because Mr. Dunan worked together with Mr. Hayashi and she had heard it was a "good old boy network" among the security officers.  Opposition CSF at ¶ 22.  Defendants dispute this fact and contend that Plaintiff Perdue later admitted that she had no basis for her suspicions other than that Mr. Hayashi and Mr. Dunan worked in the same department.  Motion CSF at ¶ 22.

Meanwhile, Plaintiff Griffin reported the violation to Mr. Hayashi's superior, Lieutenant Schnaproff on March 29, 2005, following the meeting with Mr. Hayashi.  Motion CSF at ¶ 19; Motion Exh. M at 118:22-121:23.  Lieutenant Schnaproff stated that he would investigate the matter and get back to Plaintiff Griffin.[11/]  Id.

On March 31, 2005, Mr. Hayashi sent an e-mail to Mr. Jarrett, requesting that Plaintiffs be terminated immediately from their positions at the VCC.  Motion Exh. I at 1.  Mr. Hayashi had explained in an earlier conversation with Mr. Jarrett that there were "security problems" requiring Plaintiffs' removal from the VCC.[12/]  Motion Exh. Q at 54:5-13.  Mr. Hayashi did not elaborate on what those security problems were, but Mr. Jarrett stated that he knew of no other reason for terminating Plaintiffs than their reporting of security violations.  Opposition Exh. 2 at 57:1-9.

---

[11/] Defendant JTSI states that Lieutenant Schnaproff never got back to Plaintiff Griffin regarding the investigation. Motion CSF at ¶ 19.  Plaintiffs dispute this characterization because Plaintiff Griffin only stated that he did not know the status of the investigation because he was terminated two days after speaking to Lieutenant Schnaproff.  Opposition CSF at ¶ 19.

[12/] There is no evidence as to what the actual security problems were that lead to Mr. Hayashi's request for removal of Plaintiffs.  Mr. Jarrett testified that Mr. Hayashi had explained there were security problems, but also said he did not know what those security problems were because Mr. Hayashi did not tell him.  Motion Exh. Q at 54:5-13; Opposition Exh. 2 at 57:1-9, 63:14-18.

On April 1, 2005, Plaintiffs and Mr. Goodwin met with Ms. Oania as scheduled.  Motion CSF at ¶ 28; Motion Exh. O at 12. In their meeting, however, Ms. Oania informed Plaintiffs that they were being removed from the Subcontract at the government's request, and that JTSI had to comply or else risk losing the Subcontract.  Id.  Furthermore, because JTSI did not have any open positions elsewhere, Plaintiffs were terminated.[13/]  Id.  Mr. Goodwin, however, was not terminated.  Motion CSF at ¶ 29. Plaintiffs later learned that JTSI had hired replacements to fill their positions.  Opposition Exh. 1 at ¶ 26; Complaint at ¶¶ 36-37.

A few days after his termination, Plaintiff Griffin orally reported to Colonel Stratus at the Inspector General's office about the security violations, Plaintiffs' subsequent termination, and Plaintiff Griffin's belief that he was terminated for reporting the violations.  Motion Exh. M at 106:4-108:12.  A week later, Plaintiff Griffin called the Inspector General's office, and was told by Colonel Stratus that a copy of the video was acquired, that an investigation was underway, and that because of the confidential nature of the investigation, Colonel Stratus would likely be unable to inform Plaintiff

---

[13/] Plaintiffs dispute this characterization, only to point out that the letter of termination, delivered by Ms. Oania to Plaintiffs at their meeting, stated that JTSI did not have positions for which Plaintiffs qualified, but that they were eligible for rehiring.  Opposition CSF at ¶ 27; Motion Exhs J, K.

Griffin as to the outcome of any investigation.  <u>Id.</u> at 107:19-108:8.

**STANDARD**

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.  56©.

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n</u>, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 248 (1986)) (internal citation omitted).[14/]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  <u>See Matsushita Elec. Indus. Co.,</u>

---

[14/]Disputes as to immaterial issues of fact do "not preclude summary judgment."  <u>Lynn v. Sheet Metal Workers' Int'l Ass'n</u>, 804 F.2d 1472, 1483 (9th Cir. 1986).

Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing

First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

The moving party has the burden of persuading the court

as to the absence of a genuine issue of material fact. Celotex,

477 U.S. at 323; Miller v. Glenn Miller Productions, 454 F.3d

975, 987 (9th Cir. 2006). The moving party may do so with

affirmative evidence or by "'showing'--that is pointing out to

the district court--that there is an absence of evidence to

support the nonmoving party's case." Celotex, 477 U.S. at 325.[15]

Once the moving party satisfies its burden, the

nonmoving party cannot simply rest on the pleadings or argue that

any disagreement or "metaphysical doubt" about a material issue

of fact precludes summary judgment. See Celotex, 477 U.S. 323;

Matsushita Elec., 475 U.S. at 586; Cal. Arch. Bldg. Prods., Inc.

v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir.

1987).[16] The nonmoving party must instead set forth "significant

---

[15]When the moving party bears the burden of proof at trial,
that party must satisfy its burden with respect to the motion for
summary judgment by coming forward with affirmative evidence that
would entitle it to a directed verdict if the evidence were to go
uncontroverted at trial. Miller, 454 F.3d at 987 (quoting C.A.R.
Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc., 213 F.3d
474, 480 (9th Cir. 2000)). When the nonmoving party bears the
burden of proof at trial, the party moving for summary judgment
may satisfy its burden with respect to the motion for summary
judgment by pointing out to the court an absence of evidence from
the nonmoving party. Miller, 454 F.3d at 987.

[16]Nor will uncorroborated allegations and "self-serving
testimony" create a genuine issue of material fact. Villiarimo
v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002);

probative evidence" in support of its position.   T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).   Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.   See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. See T.W. Elec. Serv., 809 F.2d at 630-31.[17/]   Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986).

Where a state court denies a party's motion for summary judgment and that case is then removed, a federal court is not bound by the state court's determination and may "revisit[] the issue after removal."   Crane v. Arizona Republic, 972 F.2d 1511, 1516 n.3 (9th Cir. 1992).   Although a federal court must "treat the state court's denial of summary judgment 'as if it had taken place in federal court,'" it is within the discretion of the

---

see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

[17/]At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Bator v. State of Hawaii, 39 F.3d 1021, 1026 (9th Cir. 1994).

federal court to grant summary judgment, despite an earlier state court denial of such a motion, if cogent reasons exist.[18]
Preaseau v. Prudential Ins. Co. of America, 591 F.2d 74, 80 (9th Cir. 1979) (quoting Butner v. Neustadter, 324 F.2d 783, 785 (9th Cir. 1963)); see also Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 530 (9th Cir. 2000) ("[W]here either cogent reasons or exceptional circumstances exist a judge may set aside or reverse a prior ruling by a colleague in the same case.").

## DISCUSSION

I.   **Count I: Hawaii Whistleblowers' Protection Act**

Plaintiffs allege that Defendant JTSI's removal and termination of Plaintiffs on April 1, 2005 was in retaliation for reporting security violations, and that this retaliation is in violation of the HWPA.  See H.R.S. §§ 378-61 to 378-69.  Section 378-62 of the HWPA states in relevant part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
>> (1) The employee, or a person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:
>>
>>> (A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a

---

[18] In this case, the state court gave no reasoning or opinion in its denial of Defendant JTSI's motion for summary judgment as to Counts I and II.  Therefore, the Court may revisit this issue as no basis for denial was ever explicated.

> political subdivision of this State, or the
> United States; or
>
> (B) A contract executed by the State, a
> political subdivision of the State, or the
> United States[.]

H.R.S. § 378-62.

Although the HWPA itself does not explicitly define the elements of a claim under § 378-62, three elements can be extrapolated from the language of the statute, together with the Hawaii Supreme Court's interpretation of claims under § 378-62. See Crosby v. State Dept. of Budget & Fin., 76 Hawai'i 332, 342, 876 P.2d 1300, 1310 (1994), cert. denied, 513 U.S. 1081 (1995); see also Nelson v. National Rental System, Inc., Civ. No. 05-00374, 2006 WL 1814341, at *3 (D. Haw. June 30, 2006) (noting the following requirements clear from the face of the statute: that the employee engaged in protected conduct such as reporting a violation of the law; and that the employer took an adverse action against the employee as a result). First, there must be a showing that the employee "engaged in protected conduct" as it is defined by the HWPA. Crosby, 76 Hawai'i at 342, 876 P.2d at 1310. Second, the employer is required to take some adverse action against the employee.[19] Third, there must be "a causal

---

[19] The second element is not at issue in this case as Defendant JTSI's removal and termination of Plaintiffs clearly qualifies as an adverse action. See Crosby, 76 Hawai'i at 341, 876 P.2d at 1309. "Legislative history confirms that the HWPA provides protection to employees who report suspected violations of law from 'any form of retaliation by their employers.'"

17

connection between the alleged retaliation and the 'whistleblowing.'" Id.; see also U.S. ex rel. Lockyer v. Hawaii Pacific Health, 490 F. Supp. 2d 1062, 1087 (D. Haw. 2007).  In other words, to meet the causal connection requirement, "[the] employer's challenged action must have been taken 'because' the employee engaged in protected conduct."  Crosby, 76 Hawai'i at 342, 876 P.2d at 1310.

    With regard to specifically proving the causal connection, the Hawaii Supreme Court adopted the scheme and sub-elements laid out in the HWPA's legislative history.  Id.  "The HWPA's legislative history indicates that the legislature intended that the required burden of proof [in showing a causal connection] be similar to that utilized in traditional labor management relations discharge cases."  Id.  In labor management retaliation cases under the National Labor Relations Act, 29 U.S.C. §§ 151-169, the employer bears "'the burden of negating causation'" once the employee makes an initial showing of a causal connection.  Id. (quoting Sonicraft, Inc. V. N.L.R.B., 905 F.2d 146, 150 (7th Cir. 1990), cert denied, 498 U.S. 1024 (1991); see also Hse. Stand. Com. Rep. No. 25, in 1987 House Journal, at

---

Crosby, 76 Hawai'i at 341, 876 P.2d at 1309 (quoting Sen. Stand. Com. Rep. No. 1127, in 1987 House Journal, at 1392) (emphasis in original).  Thus, either the Plaintiffs' removal from their VCC assignment, or their ultimate termination, on its own would suffice as an adverse employment action for purposes of the HWPA.

1090 (noting the "existing custom and practice of placing the burden of proof on the employer in [labor management] discharge cases").

Thus, the causal connection requirement under the HWPA has two stages of proving or negating the causation between the protected conduct and the employee's termination. First, the employee must make a prima facie showing "that his or her protected conduct was a 'substantial or motivating factor'[20] in the decision to terminate the employee." Crosby, 76 Hawai'i at 342, 876 P.2d at 1310; accord Nabors Alaska Drilling, Inc. v. N.L.R.B., 190 F.3d 1008, 1015 (9th Cir. 1999). Second, once the employee makes its prima facie showing, the employer must then "'defend affirmatively by showing that the termination would have

_____

[20] Whether employee conduct was either a "substantial" or a "motivating" factor in terminating an employee likely requires a different degree of proof, and so this characterization of the employee's burden is ambiguous. Courts applying this same standard in labor management cases have struggled to delineate the exact threshold for a "substantial or motivating factor" and instead, have generally only required a showing that the protected conduct was a motivating factor, without examining its substantiality. See, e.g., Nabors Alaska Drilling, Inc. v. N.L.R.B., 190 F.3d 1008, 1015 (9th Cir. 1999) (requiring only a showing that protected conduct was a "motivating factor"); N.L.R.B. v. Nevis Industries, Inc., 647 F.2d 905, 909 (9th Cir. 1981) ("motivating factor"); N.L.R.B. v. Searle Auto Glass, Inc., 762 F.2d 769, 773 (9th Cir. 1985) ("motivating factor"); Director, OWCP v. Greenwich Collieries, 512 U.S. 267, 278 (1994) (employee is required to show "that antiunion sentiment contributed to the employer's decision") (emphasis added). The Hawaii Supreme Court seems to agree that there is no required level of substantiality, requiring only that the employee's protected conduct "played a role in the employer's action." Crosby, 76 Hawai'i at 342, 876 P.2d at 1310.

occurred regardless of the protected activity.'" <u>Crosby</u>, 76
Hawai'i at 342, 876 P.2d at 1310 (quoting <u>N.L.R.B. v. Howard</u>
<u>Elec. Co.</u>, 873 F.2d 1287, 1290 (9th Cir. 1989); <u>see also</u> <u>N.L.R.B.</u>
<u>v. Searle Auto Glass, Inc.</u>, 762 F.2d 769, 773 (9th Cir. 1985)
("[A]s an affirmative defense, the employer may show by a
preponderance of the evidence that the employee would have been
terminated even in the absence of the protected conduct."); 
<u>Nabors Alaska Drilling</u>, 190 F.3d at 1015 (holding that once the
employee makes its prima facie showing, "[t]he burden then shifts
to the employer to prove that legitimate reasons supported the
termination").

An employer may negate causation ex post facto by
presenting evidence of other reasons for termination outside of
the protected conduct, even if the other reasons were unknown to
the employer at the time of termination.  <u>Nabors Alaska Drilling</u>,
190 F.3d at 1015 ("The employer can fulfill its burden by
demonstrating that facts discovered after termination gave rise
to a legitimate basis for discharge, even if the employee was
originally fired for an improper reason.").

**A.    Questions of Material Fact Exist as to Whether
       Plaintiffs' Removal and Termination was in Retaliation
       for Reporting Security Violations**

Defendant JTSI does not dispute that Plaintiffs were
engaged in protected conduct under the HWPA in attempting to
report what they believed were security violations; nor is there

a dispute that either the removal or termination of Plaintiffs would suffice as an adverse employment action.  The Court finds, for the purposes of this motion, that Plaintiffs have satisfied the first and second elements of an HWPA claim.  Thus, the parties' dispute is solely as to whether the causal connection between the protected activity and the alleged retaliation is satisfied.

**1.    The close proximity of time and uncertainty as to Defendant JTSI's motivation satisfy Plaintiffs' prima facie showing of causation**

Defendant JTSI argues that Plaintiffs have failed to provide sufficient evidence to raise an issue of fact as to Defendant JTSI's motivation in terminating Plaintiffs.  Reply at 2.  However, given the close temporal proximity between Plaintiffs' reporting to outside government officials and their ultimate removal and termination, along with Defendant JTSI's alleged indifference toward Plaintiffs' complaints, and in viewing all the evidence and drawing all inferences in favor of Plaintiffs, see T.W. Elec. Serv., 809 F.2d at 630-31, a reasonable jury could infer that Plaintiffs were removed and terminated because of their attempts to report violations of government security procedures.  Therefore, summary judgment must be denied because Defendant JTSI has failed to meet its burden of persuading the Court that no genuine issue of material fact

exists as to the motivation for Plaintiffs' removal and termination.

To show that an employee's protected conduct was a "substantial or motivating factor" in the employer's decision to terminate, "a plaintiff can introduce evidence regarding the 'proximity in time between the protected action and the allegedly retaliatory employment decision,' from which a 'jury logically could infer [that the plaintiff] was terminated in retaliation[.]'"[21/] Coszalter v. City of Salem, 320 F.3d 968, 977 (9th Cir. 2003)[22/] (quoting Keyser v. Sacramento City Unified Sch. Dist., 265 F.3d 741, 751 (9th Cir. 2001)).  Though an employee may always present direct evidence of motive, proximity in time is one type of circumstantial evidence that is sufficient on its

_____

[21/] The Court is instructed by, but does not rely on, a similar conclusion reached by Judge Seabright on a motion for summary judgment under the HWPA.  See Timpe v. WATG Holdings Inc., Civ. No. 07-00306, 2008 WL 2355611, at *9 (D. Haw. June 10, 2008)(denying a motion for summary judgment on an HWPA claim because in "[d]rawing all reasonable inferences in favor of Plaintiff, the close temporal proximity between the report and Plaintiff's termination, combined with the short duration of Plaintiff's employment and surrounding circumstances–a reasonable trier of fact could conclude that Plaintiff's report was a substantial or motivating factor for her termination") (internal citations omitted).

[22/] Although Coszalter involved a § 1983 claim for retaliatory termination in violation of the employee's First Amendment rights, the plaintiff was required to make the same showing as Plaintiffs here, namely "that his or her speech was a 'substantial or motivating' factor for the adverse employment action."  Coszalter, 320 F.3d at 973.

own to meet the plaintiff's burden.  See Allen v. Iranon, 283
F.3d 1070, 1077 (9th Cir. 2002).

There is no dispute that at the March 29, 2005 meeting
with all VCC personnel, Mr. Hayashi stated that "this job is not
for everyone."  Opposition Exh. 2 at 67:2-12; Motion Exh. Q at
67:2-12.  Plaintiffs contend that Mr. Hayashi further stated that
those reporting violations should look at the bigger picture, and
that if they did not comply, they should seek employment
elsewhere.  Opposition Exh. 1 at ¶¶ 14-15.  Plaintiffs also
contend that Mr. Hayashi stated that despite any behavior up to
that point, all VCC personnel "had job security."  Motion Exh. O
at 10.  However, two days after Mr. Hayashi's meeting with the
VCC personnel, Mr. Hayashi sent an e-mail to Mr. Jarrett
requesting Plaintiffs' removal from the Subcontract; Plaintiffs
were officially terminated the next day.  Motion Exhs. I, J, K.
During that two day period, Plaintiffs continued to report the
alleged security violations to other military offices.[23/]

---

[23/] Defendant JTSI argues Mr. Goodwin similarly reported
security violations, but was not terminated, and thus, this
proves that Plaintiffs were not terminated because of their
reporting.  The Court notes, however, that Mr. Goodwin did not
continue to report security violations after the March 29 meeting
to the extent Plaintiffs did.  Mr. Goodwin did participate in
Plaintiffs' conversation with Mr. Jarrett immediately following
the March 29 meeting.  Motion CSF at ¶ 17; Opposition Exh. 1 at ¶
16; Motion Exh. O at 10-11.  Mr. Goodwin did also show up for the
meeting with Ms. Oania that Plaintiff Griffin and Mr. Goodwin had
scheduled several days prior to the March 29 meeting, in which
meeting Plaintiffs received notice of their termination.  Motion
Exh. O at 10; Motion CSF at ¶ 10.  However, Mr. Goodwin never

A reasonable trier of fact could infer, therefore, that the Plaintiffs' persistent reporting, particularly after the March 29 meeting, motivated their removal and termination by Defendant JTSI.  "Retaliation often follows quickly upon the act that offended the retaliator[.]" <u>Coszalter</u>, 320 F.3d at 978. Thus, Plaintiffs have made a prima facie showing because the circumstantial evidence of the timing of Plaintiffs' removal and termination raises a question of fact as to whether Plaintiffs' conduct "played a role" in the motivation for their removal and termination.  <u>Crosby</u>, 76 Hawai'i at 342, 876 P.2d at 1310.

### 2. Defendant has not negated the causal connection shown by Plaintiffs

Defendant JTSI can negate the causal connection by showing that Plaintiffs' removal and termination from the VCC "would have occurred regardless of the protected activity." <u>Crosby</u>, 76 Hawai'i at 342, 876 P.2d at 1310.  Defendant JTSI contends that despite the time proximity, it acted purely at the request of the government and thus no causal connection exists.[24/]

---

reported the security violations to anyone outside of JTSI; moreover, he did not report the violations to anyone new after the March 29 meeting.  The Court thus finds that Mr. Goodwin's behavior was substantially different from that of the Plaintiffs.

[24/] Mr. Jarrett stated in his deposition that he was unaware of any other reason for Plaintiffs' removal and termination other than their reporting of the alleged security violations. Opposition Exh. 2 at 57:1-9.  Thus, Defendant JTSI relies solely on its argument that it terminated Plaintiffs only at the government's request.  Therefore, any question of fact as to this point would preclude summary judgment.

However, Defendant JTSI's alleged indifference toward Plaintiffs' complaints raises a question of material fact as to the causal connection element and supports an inference that Defendant JTSI may have also been motivated by a desire to silence the Plaintiffs.

Plaintiffs began reporting security violations within JTSI at least two months prior to their ultimate removal and termination.[25/]  Motion Exhs. O at 9, F at 1-2; <u>see also</u> Opposition Exh. 1 at ¶ 4.  Defendant JTSI, however, seems to have failed to act on these initial reports, never responding to Plaintiffs' complaints.  <u>See</u> Motion Exh. N at 80:2-13, 83:17-84:2.  Thus, Plaintiffs were unsure that Defendant JTSI was ever going to act on their reports, and began to report directly to the government security officers.  <u>Id.</u> at 84:12-15.  Later, when Plaintiffs approached Mr. Jarrett directly, he encouraged Plaintiffs to discontinue their efforts.  Exh. N at 90:16-24, 167:1-3.  Defendant JTSI argues that JTSI had no obligation to do anything further once it forwarded Plaintiffs' report on to the United States.  Motion Exh. Q at 66:14-16.

Although Mr. Hayashi did request Plaintiffs' removal from the VCC, a reasonable trier of fact could find that

---

[25/] Plaintiffs presented evidence that when Plaintiffs began to raise their concerns, Mr. Hayashi specifically instructed them that any reporting should not go through him, but exclusively through JTSI.  Motion Exh. M at 151:8-13.

Defendant JTSI actually removed Plaintiffs in order to silence
any more complaints, as well as to ease any tension between the
government and Defendant JTSI created by Plaintiffs' persistent
complaints.  In other words, a reasonable inference can be made
that Defendant JTSI may have already planned on terminating
Plaintiffs, but waited until the government requested their
removal in order to disguise its retaliatory motivation.  <u>See</u>
<u>Coszalter</u>, 320 F.3d at 978 ("For a variety of reasons, some
retaliators prefer to take their time:  They may wait until the
victim is especially vulnerable or until an especially hurtful
action becomes possible.  Or they may wait until they think the
lapse of time disguises their true motivation.").

     Defendant JTSI argues that Mr. Hayashi "had reasonable
and legitimate bases" to terminate Plaintiffs[26]; specifically,

---

[26] Defendant JTSI further defends that because of the
government's request for Plaintiffs' removal, Defendant JTSI was
forced to comply or risk losing the Subcontract.  Motion CSF at ¶
28; Motion Exh. O at 12.  However, Defendant JTSI admits that
"the Subcontract does not authorize the United States to
determine whom JTSI must hire or fire."  Reply at 4.  The Court's
review of the Prime Contract and Subcontract agrees with this
point, finding no specific provision in the Prime Contract or
Subcontract allowing the United States to direct the removal of
employees of the Contractor or Subcontractor.  Thus, it would
initially appear that Defendant JTSI was not contractually bound
by Mr. Hayashi's request for Plaintiffs' removal.  Defendant JTSI
further argues, however, that FAR clause 52.246-6 does allow the
United States to remove employees if it is necessary "to replace
or correct services."  <u>See</u> Motion at 31-32.  To support this
point, Defendant JTSI only cites to cases where the entire
contract was terminated after the contractor failed to cure its
defective services.  <u>See, e.g.</u>, <u>Appeal of Rienne</u>, 91-1 B.C.A. P
23432, 1990 WL 157097 (Eng.B.C.A. October 12, 1990) (contracting

that Plaintiffs were terminated because they violated Department

of Defense (DoD) regulations in reporting classified and

unclassified information.[27/]   See Motion at 24, 25-26.   However,

_____

officer rightly terminated contract after requesting cure of
services because contractor's masonry work was inadequate and
because the contractor's crew was inexperienced in masonry work);
Appeal of Tilbury, Inc., 90-2 B.C.A. P 22773, 1990 WL 101585
(A.S.B.C.A. Feb. 21, 1990) (Navy contracting officer rightly
terminated contract after requesting cure of services because of
contractor's operation and maintenance of radio transmitters).
The Court does not find these cases comparable to the current
case at hand.   Here, the government never stated that it was
contemplating the termination of the entire Subcontract.
Further, if the government wished for Defendant JTSI to correct
faulty services under the contract, the government, through its
contracting officer, was required to make an official cure notice
to JTSI, which it did not do.   See FAR clause 52.246-20, 48
C.F.R. § 52.246-20 (incorporated by reference into both the Prime
Contract and Subcontract).

[27/] The relevant portion of the DoD supplement to the Federal
Acquisition Regulations ("DFAR") states:

> (a) The Contractor shall not release to anyone outside
> the Contractor's organization any unclassified
> information, regardless of medium (e.g., film, tape,
> document), pertaining to any part of this contract or any
> program related to this contract, unless—
>> (1) The Contracting Officer has given prior written
>> approval; or
>> (2) The information is otherwise in the public
>> domain before the date of release.
> . . . (c) The Contractor agrees to include a similar
> requirement in each subcontract under this contract.
> Subcontractors shall submit requests for authorization to
> release through the prime contractor to the Contracting
> Officer.

DFAR clause 252.204-7000, 48 C.F.R. § 252.204-7000; Motion at 25.
This provision is incorporated by reference into the Subcontract.
Motion Exh. A, Tab 3 at 1.

this explanation fails to satisfy Defendant JTSI's burden for two reasons.

First, if Plaintiffs violated the DFAR provision by reporting outside of their contracting organization and its chain of command, they only did so after all attempts to report within the organization fell on deaf ears.  Defendant contends that Plaintiffs violated the DFAR clause when they reported the security problems to Sergeant Ahn of the Army Criminal Investigations Division, Kenny Wheeler of the NCIS, and the local PMO.  However, Plaintiffs only reported to these officials after months of efforts to report within JTSI and directly to Mr. Hayashi proved fruitless and received no adequate investigation. Opposition Exh. 1 at ¶¶ 18-21; Motion CSF at ¶ 20; Motion Exh. O at 11.  Defendant JTSI cannot now claim that Plaintiffs violated the DFAR provision when any outside reporting by Plaintiffs may have been due to Defendant JTSI's failure to act.[28]

Second, the explanation that Plaintiffs' violation of the DFAR regulation was grounds for termination still relies on Plaintiffs' protected conduct as the basis for that termination. An employer cannot argue that the protected conduct itself

---

[28] The Court notes that Plaintiffs only reported to other military security offices and thus the concern in assuring protection of military information was likely not compromised anyway.  Moreover, an issue of fact exists as to whether the information that Plaintiffs reported to these military agencies is even the type protected by the DFAR provision.

created a reason for termination other than a retaliatory one. See N.L.R.B. v. Mike Yurosek & Son, Inc., 53 F.3d 261, 267 (9th Cir. 1995) (holding that an employer "misses the point" and "failed to meet its burden" where the employer argued that employees who engaged in the protected conduct of refusing to work an extra hour were lawfully punishable for being insubordinate in not working the extra hour). Instead, the employer's burden is to show "why the employees would have been terminated absent that conduct." Id. (emphasis added). Here, an alleged violation of a DFAR regulation because of Plaintiffs' reporting fails to show that Plaintiffs would have been terminated absent their reporting.

Defendant further argues that there is no causal connection because this case is comparable to Crosby v. State, where the Hawaii Supreme Court held that the plaintiff failed to show a causal connection between plaintiff's expression of disapproval for his superior's decision and his removal from a work project. 76 Hawai'i at 344, 876 P.2d at 1312. In Crosby, the plaintiff was an employee of the State of Hawaii Department of Budget and Finance, who voiced his concern that his superiors and other government offices were misinterpreting a state statute. Id. at 336, 876 P.2d at 1304. After many attempts to protest his superior's interpretation of the statute, the plaintiff was eventually removed from the project and reassigned.

29

Id. at 339, 876 P.2d at 1307.  The Hawaii Supreme Court, in affirming the trial court's decision, held that there was "substantial, credible evidence to justify a reasonable conclusion that the State's primary motive in removing Crosby from the project was to ensure that the project was completed expeditiously [and not that he was removed because of his protests]."  Id. at 344, 876 P.2d at 1312.

Crosby is distinguishable from this case in at least two ways.  First, the procedural posture of Crosby was an appeal from a bench trial, not a motion for summary judgment, thus there was no question as to the existence of issues of material fact. Id. at 339, 876 P.2d at 1307.  Second, the defense in Crosby presented "substantial, credible evidence" supporting an alternate motive for the plaintiff's reassignment, thus negating the causal connection between plaintiff's statements and his reassignment.  Id. at 344, 876 P.2d at 1312.  As noted above, Defendant JTSI has failed to present evidence that Plaintiffs would have been removed regardless of their protected conduct. Thus, Defendant JTSI failed to negate the inference of a causal connection created by the close temporal proximity of Plaintiffs' reporting and their removal and termination.

**B.    The Government Contractor Defense Does Not Preempt Plaintiffs' Claim Against Defendant JTSI Because No Reasonably Precise Specifications Exist to Warrant Its Application**

Defendant JTSI asserts that the government contractor defense applies in this case and precludes any recovery against Defendant JTSI.  This Court finds that the government contractor defense is limited in its application to suits where precise government specifications as to the subject of the contract exist, and those specifications are the subject of the suit. Given the lack of any reasonably precise specifications on these facts, the government contractor defense does not apply.[29/]

The most recent incarnation of the government contractor defense appeared in <u>Boyle v. United Technologies Corp.</u>, 487 U.S. 500 (1988).  In <u>Boyle</u>, the father of a military pilot brought a wrongful death action against the builder of government helicopters, after the pilot died when he was unable to escape from a crashed helicopter and drowned as a result.  <u>Id.</u> at 504.  At trial, the jury returned a verdict for the father, but the Court of Appeals for the Fourth Circuit reversed, holding that the military contract defense precluded liability of the government contractor.  <u>Id.</u> at 503-504.  Granting certiorari, the Supreme Court agreed that the government contractor defense did preclude liability where "a 'significant conflict' exists" between federal and state law in areas of "uniquely federal

---

[29/] Because this Court determines that the first requirement of reasonably precise specifications is not satisfied under these facts, it is unnecessary to determine if the second and third elements are met in this case.

interests." Id. at 507 (quoting Wallis v. Pan Am. Petroleum
Corp., 384 U.S. 63, 68 (1966)).

The Supreme Court proceeded to adopt the standards of
the Fourth and Ninth Circuits in determining the scope of the
government contractor defense:

> Liability for design defects in military equipment cannot
> be imposed, pursuant to state law, when (1) the United
> States approved reasonably precise specifications; (2)
> the equipment conformed to those specifications; and (3)
> the supplier warned the United States about the dangers
> in the use of the equipment that were known to the
> supplier but not to the United States.

Id. at 512.  Finally, the Supreme Court explained that the policy
in applying the government contractor defense is to prevent the
ultimate financial burden of government contractor liability from
passing to the government:

> The financial burden of judgments against the contractors
> would ultimately be passed through, substantially if not
> totally, to the United States itself, since defense
> contractors will predictably raise their prices to cover,
> or to insure against, contingent liability for the
> Government-ordered designs. To put the point differently:
> It makes little sense to insulate the Government against
> financial liability for the judgment that a particular
> feature of military equipment is necessary when the
> Government produces the equipment itself, but not when it
> contracts for the production.

Id. at 511-12.

The Supreme Court in Boyle did not limit the defense to
a specific type of contract.  Boyle was a procurement contract
case, and the Supreme Court emphasizes that the defense would be
applicable where the defective design of equipment caused the

harm.  Id. at 511-513.  In explaining the origins of the defense,
the Court also referred to Yearsley v. W.A. Ross Const. Co., 309
U.S. 18 (1940), the first case to apply some form of the
government contractor defense.  Boyle, 487 U.S. at 506.  Yearsley
was a performance contract case, where the Supreme Court held
that the government contractor defense protected a construction
contractor from liability for erosion caused by its building of
dikes under a government contract.  309 U.S. at 20-21.  The Boyle
Court explained that there is "no basis for a distinction"
between procurement and performance contracts in applying the
government contractor defense.[30]  487 U.S. at 506.

---

[30] Because the Court finds the lack of reasonable precise
specifications precludes application of the government contractor
defense, the Court need not determine the precise boundaries of
the defense as defined by the Ninth Circuit.  Since Boyle, the
Courts of Appeals have varied greatly in their range of
application of the defense.  See generally Hazel Glenn Beh, The
Government Contractor Defense: When Do Governmental Interests
Justify Excusing A Manufacturer's Liability for Defective
Products?, 28 Seton Hall L. Rev. 430, 451-55 (1997)(summarizing
the various applications of the defense in other Circuits, while
emphasizing the limitations of the defense in the Ninth Circuit
to contracts dealing with military equipment and resources).  The
Ninth Circuit seems to limit the application of the defense to
contracts involving specifications for the design or production
of military equipment or operation of military facilities.  See
In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 811 (9th Cir.
1992) ("That Boyle speaks of the military contractor defense as
immunizing contractors only with respect to the military
equipment they produce for the United States is consistent with
the purposes the Court ascribes to that defense."); In re Hanford
Nuclear Reservation Litigation, 534 F.3d 986, 1000 (9th Cir.
2008) ("[T]he government contractor defense applies not only to
claims challenging the physical design of a military product, but
also to the process by which such equipment is produced.").
However, the Ninth Circuit also cites to Yearsley with approval,

The first requirement for application of the government contractor defense is the existence of "reasonably precise specifications" which are approved by the government.  Id. at 512; see also McKay v. Rockwell Intern. Corp., 704 F.2d 444, 451 (9th Cir. 1983).  There must be a "'back and forth dialogue culminating in approval,' and '[a] continuous exchange between the contractor and the government' . . . [in order] to satisfy Boyle's first condition[.]"  Butler v. Ingalls Shipbuilding, Inc., 89 F.3d 582, 585 (9th Cir. 1986) (quoting Tate v. Boeing Helicopters, 55 F.3d 1150, 1156 (6th Cir. 1995); Kleemann v. McDonnell Douglas Corp., 890 F.2d 698, 702 (4th Cir. 1989)).  Defendant JTSI argues that Mr. Hayashi's request for Plaintiffs' removal satisfies the specifications requirement.

Mr. Hayashi's request is insufficient to meet the first requirement because it is not a precise specification as to Defendant JTSI's actual security services, and because a two sentence e-mail is insufficient to be deemed a set of government specifications.  "When only minimal or very general requirements are set for the contractor by the United States the [government contractor] rule is inapplicable.  The situation is different

---

which did not involve a contract with the military.  See McKay, 704 F.2d at 448 (citing to Yearsley as the first case to articulate the government contractor defense, which "protects a government contractor from liability for acts done by him while complying with government specifications during execution of performance of a contract with the United States").

where the United States reviewed and approved a detailed set of specifications."[31/]  McKay, 704 F.2d at 450.  Thus, "Government approval 'requires more than a rubber stamp.'"  Snell v. Bell Helicopter Textron, Inc., 107 F.3d 744, 748 (9th Cir. 1997) (quoting Trevino v. General Dynamics Corp., 865 F.2d 1474, 14880 (5th Cir. 1989)).  Applying this definition in this case, Mr. Hayashi's request is not a "specification" at all.[32/]

---

[31/] Where the government delineates detailed specifications, and the contractor merely implements them, the contractor may argue that he is merely acting in place of the government.  See Yearsley, 309 U.S. at 22 (quoting U.S. v. Lynah, 188 U.S. 445, 465 (1903)) (finding that a construction contractor building dikes based on government specifications is an agent of the government and holding that "there is no ground for holding [the government's] agent liable who is simply acting under the authority thus validly conferred.  The action of the agent is 'the act of the government'"); see also Boyle, 487 U.S. at 525 (Brennan, J., dissenting) ("Had respondent merely manufactured the CH-53D helicopter, following minutely the Government's own in-house specifications, it would be analogous to the contractor in Yearsley, although still not analytically identical since Yearsley depended upon an actual agency relationship with the Government.").

[32/] The Court cannot justifiably hold that Mr. Hayashi's e-mail could reasonably be compared to the "specifications" at issue where the government contractor defense has been considered.  See, e.g., Boyle, 487 U.S. 500 (defense applies to design specifications for military helicopter's emergency escape system); In re Hanford Nuclear Reservation Litigation, 534 F.3d 986 (9th Cir. 2008) (discussing the defense, but ultimately refusing to apply the defense to a plutonium production facility that assisted in production of the atomic bombs used in World War II); Hudgens v. Bell Helicopters/Textron, 328 F.3d 1329 (11th Cir. 2003) (defense applies to specifications as to the maintenance of Army helicopters); Snell v. Bell Helicopter Textron, Inc., 107 F.3d 744 (9th Cir. 1997) (question of fact precluded application of the defense to specifications for manufacturing of Marine Corps helicopters); Richland-Lexington Airport Dist. v. Atlas Properties, Inc., 854 F. Supp. 400, 422

Further, Mr. Hayashi's e-mail cannot be considered a
specification of the Subcontract because it did not deal directly
with Defendant JTSI's contracted-for services and obligations.
For example, had Mr. Hayashi met with Defendant JTSI on several
occasions regarding security procedures at the VCC, and
ultimately issued a memo to Defendant JTSI establishing new
security procedures to be implemented by VCC personnel, such a
communication could be a reasonably precise specification.
Likewise, if an individual were harmed in some way from Defendant
JTSI's implementation of those hypothetical procedures approved
by the government, Defendant JTSI could argue for application of
the government contractor defense in a subsequent lawsuit.[33]
Here, however, Mr. Hayashi's e-mail to Mr. Jarrett cannot be

---

(D.S.C. 1994) (defense applies to specifications of the
Environmental Protection Agency to hazardous waste cleanup
company); Butler v. Ingalls Shipbuilding, Inc., 89 F.3d 582 (9th
Cir. 1996) (defense applies to design specifications of Navy
accommodation ladder); In re Hawaii Federal Asbestos Cases, 960
F.2d 806 (9th Cir. 1992) (defense does not apply to manufacturing
specifications of asbestos insulation sold to the Navy); McKay,
704 F.2d 444 (defense applies to design specifications of the
escape system on Navy aircraft); Yearsley, 309 U.S. 18 (defense
applies to government specifications for building dikes); Lamb v.
Martin Marietta Energy Systems, Inc., 835 F. Supp. 959 (W.D.Ky.
1993) (defense applies to production specifications at nuclear
facility).

[33] Another example under these facts would be if Ms.
Tominaga was terminated by JTSI for allowing Mr. Baker access to
the VCC and its computer system.  In a hypothetical suit by Ms.
Tominaga against JTSI, JTSI could argue that the government
specifications and procedures under the Subcontract requiring
proper clearance draw closer to the first requirement of the
government contractor defense.

similarly characterized as a specification of Defendant JTSI's obligation under the contract for security and information services.[34]

**II.  Count II: Wrongful Termination in Violation of Public Policy**

Plaintiffs also claim that they were terminated in violation of public policy.  Hawaii common law allows such a cause of action for at-will employees, providing that "an employer may be held liable in tort where his discharge of an employee violates a clear mandate of public policy."  Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625, 631 (1982).  To determine if an employee termination raises a colorable Parnar claim, "courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme." Id.  Because of the "somewhat vague meaning of the term 'public policy,'" a claim under Parnar further requires a violation of a "clearly defined policy."  Id. at 379, 652 P.2d at 630-31; see also Takaki v. Allied Machinery Corp., 87 Hawai'i 57, 63, 951 P.2d 507, 513 (Haw. App. 1998)(holding that Parnar only applies where "'clear' public policy is involved").

---

[34] Allowing a request like Mr. Hayashi's to be characterized as a "reasonably precise specification" would essentially absolve all government contractors from liability if they simply provided evidence that they were in some way acting at the government's instruction.  The Court finds that such an application would be inconsistent with Boyle, its progeny, and the three established requirements of the government contractor defense.

A.   **The HWPA Provides that Employees May Bring Both a Common Law Parnar Claim and a Claim Under § 378-62 Simultaneously**

Although Parnar claims may be brought where there would otherwise be no remedy for wrongful termination, Parnar claims are generally duplicative, and thus disallowed, where statutes and regulations creating the public policy have their own built in remedy.  See Ross v. Stouffer Hotel Co., 76 Hawai'i 454, 464, 879 P.2d 1037, 1047 (1994)(holding that where "statutory or regulatory provisions which evidence the public policy themselves provide a remedy for the wrongful discharge, provision of a further remedy under the public policy exception is unnecessary"); see also Batacan v. Reliant Pharmaceuticals, 324 F. Supp. 2d 1144, 1145 (D. Haw. 2004)(recognizing that Hawaii law does not allow Parnar claims where "the public policy at issue is contained in a statute . . . [that] provides a remedy for violations of that policy."); Hew-Len v. F.W. Woolworth, 737 F. Supp. 1104, 1107 (D. Haw. 1990)("Where the policy is one created by statute, the statutory remedy is exclusive.").

In other words, Parnar claims are usually raised only in "a 'narrow class of cases' where the wrongful discharge action is seen as necessary to effectuate the public policy at stake." Ross, 76 Hawai'i at 464, 879 P.2d at 1047 (quoting Lapinad v. Pacific Oldsmobile-GMC, Inc., 679 F. Supp. 991, 993 (D. Haw.

1988)[35], abrogated on other grounds by Courtney v. Canyon

Television & Appliance Rental Inc., 899 F.2d 845, 851 (9th Cir.

1990)).[36]  This necessity usually arises only where a statutory

or other policy does not itself provide for a remedy to enforce

the policy.

An exception to this general rule occurs where the

legislative body specifically provides that a common law claim

exists even though a statutory remedy is also in place.  Ross, 76

Hawai'i at 465, 879 P.2d at 1047 (holding that the narrowing of

the use of Parnar claims only applies "absent a clear expression

of legislative intent to the contrary," and citing to H.R.S. §

---

[35]  In Lapinad, this Court emphasized its  "reluctan[ce] . .
. to extend the [Parnar] public policy exception to the at will
doctrine beyond what is necessary to protect the public
interest[.]"  679 F. Supp. at 993.  It is clear in this specific
instance, however, that the Hawaii legislature has established
that the ability to bring both a statutory HWPA claim and a
common law claim is necessary to protect the public interest.
Further, Lapinad's holding was based on the Court's reluctance to
impose "a further remedy go[ing] beyond what the legislature
itself thought was necessary."  Id.  Here, however, it is the
legislature that has explicitly provided a further remedy, and
not the Court.

[36]  None of the cases cited in this section to this point
were cases involving the HWPA.  See Lapinad, 679 F. Supp. 991
(Title VII sex discrimination case); Ross, 76 Hawai'i 454
(employment discrimination case under State Fair Employment
Practices Law, HRS § 378-2); Batacan, 324 F. Supp. 2d 1144
(pregnancy discrimination, sex discrimination, and Family and
Medical Leave Act case); Hew-Len, 737 F. Supp. 1104 (employment
discrimination case under HRS § 378-2).  Thus, the Court
reaffirms the narrow application of Parnar claims in these cases.
Here, the Court's broader inclusion of both statutory and Parnar
claims is limited to claims arising under the HWPA.

378-69 as an example of such legislative intent).  Under the
HWPA, the Hawaii legislature provided specifically that claims
for discharge in violation of the HWPA do not preclude a
plaintiff from also alleging a simultaneous Parnar claim.  See
H.R.S. § 378-69.[37/]  Section 378-69 was included in the HWPA
specifically to allow for the expansion of Parnar claims and
allow for a claimant under the HWPA to also raise a Parnar claim:

> Your Committee does not believe that the Legislature
> should stifle or restrict the developing common law
> [Parnar claims].  Therefore, a new section [378-69] was
> added to provide that the statutory rights of action
> created herein are not to be construed to limit the
> development of the common law or as a legislative
> preemption of the common law on practices sought to be
> prohibited by this Act.

Hse. Stand. Com. Rep. No. 25, in 1987 House Journal, at 1090.

Thus, although Parnar claims are generally limited to situations
where no other remedy exists, the HWPA is an explicit exception
where the legislature has provided for both a common law and
statutory remedy.

---

[37/] Section 378-69 states in relevant part:

The rights created herein shall not be construed to limit
the development of the common law nor to preempt the
common law rights and remedies on the subject matter of
discharges which are contrary to public policy.  In the
event of a conflict between the terms and provisions of
this part and any other law on the subject the more
beneficial provisions favoring the employee shall
prevail.

Given the clear legislative intent, Plaintiffs may properly raise their <u>Parnar</u> claim for wrongful termination in violation of public policy, even when that public policy is whistleblower protection under the HWPA.   <u>See</u> <u>Nelson v. National Rental System, Inc.</u>, Civ. No. 05-00374, 2006 WL 1814341, at *5 (D. Haw. June 30, 2006)("[E]mployee whistleblowers may bring a <u>Parnar</u> wrongful termination claim even though their rights as whistleblowers are also protected under § 378-62.").

**B.    Questions of Fact Remain as to Whether Plaintiffs' Termination was in Violation of Public Policy**

As the Court has already articulated in Section I.A., <u>supra</u>, Defendant JTSI has failed to meet its burden in showing that no genuine issues of material fact exist.   Because questions of fact exist as to the motivation for Plaintiffs' removal and termination, Plaintiffs' Count I cannot be disposed of on summary judgment.   Further, because Plaintiffs' Count II is based at least in part on the public policy articulated in H.R.S. § 378-62, Count II must also survive summary judgment.[38]   Therefore, Defendant JTSI's Motion as to Count II is also denied.[39]

_____

[38] This Court has previously held, and now reiterates, that "[a] common-law <u>Parnar</u> claim is not an alternative method to seek a remedy if the underlying statutory claim fails.   <u>Lockyer</u>, 490 F. Supp. 2d at 1081.   Therefore, if Plaintiffs' § 378-62 claim later fails, its <u>Parnar</u> claim based on the policy articulated in § 378-62 will also fail.

[39] Because the Court denies Defendant JTSI's Motion for Summary Judgment, it is unnecessary for the Court to reach a determination as to Plaintiffs' 56(f) request.

## CONCLUSION

For the foregoing reasons, the Court:

(1) DENIES Defendant JTSI's Motion for Summary Judgment as to Plaintiffs' claim for violation of the HWPA because issues of material fact exist as to Defendant JTSI's motivation for removing and terminating Plaintiffs; and

(2) DENIES Defendant JTSI's Motion for Summary Judgment as to Plaintiffs' claim for wrongful termination in violation of state public policy because of the existence of the same issues of fact.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 6, 2008.



_____
Alan C. Kay
Sr. United States District Judge

Griffin, et al. v. JTSI, Inc., et al., Civ. No. 08-00242 ACK-LEK, Order Denying Defendant JTSI's Motion for Summary Judgment.