IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JORDAN GRIFFIN and CHERYL PERDUE, | )<br>) Civ. No. 08-00242 ACK-LEK<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| JTSI, INC., UNITED STATES, and DOE DEFENDANTS 2-10, | )<br>) |
| Defendants. | )<br>)<br>) |

**ORDER GRANTING DEFENDANT UNITED STATES'S MOTION TO DISMISS AND
GRANTING DEFENDANT JTSI'S SECOND MOTION FOR SUMMARY JUDGMENT**

Defendant United States moves this Court for dismissal
for lack of jurisdiction based on the discretionary function
exception of the Federal Tort Claims Act. Defendant JTSI, Inc.,
moves this Court for summary judgment for the second time in this
matter. The Court finds that the discretionary function
exception does preclude liability against Defendant United States
and that because no genuine issue of material fact exists as to
the applicability of the government contractor defense, Defendant
JTSI, Inc. is entitled to judgment as a matter of law.
Accordingly, the Court grants both the Motion to Dismiss and the
Second Motion for Summary Judgment.

**PROCEDURAL BACKGROUND**

On November 6, 2008, this Court denied Defendant JTSI,
Inc.'s ("JTSI") First Motion for Summary Judgment ("First MSJ

Order") as to Counts I and II of Plaintiffs Jordan Griffin

("Plaintiff Griffin") and Cheryl Perdue's ("Plaintiff Perdue")

(collectively, "Plaintiffs") First Amended Complaint.  <u>See</u>

Ordering Denying Defendant JTSI's Motion for Summary Judgment, CV

08-00242, No. 37 (D. Haw. Nov. 6, 2008).  The Court denied the

Motion on the basis that genuine issues of material fact existed

as to the circumstances of Plaintiffs' removal.  Therefore, the

Court could not determine, as a matter of law, whether the

government contractor defense shielded JTSI, and if not, whether

JTSI had provided sufficient evidence to negate the causation

requirement of a whistleblower claim.  <u>See</u> <u>id.</u>

     Plaintiffs' First Amended Complaint alleged that JTSI

and Defendant United States ("United States")[1] violated the

Hawai'i Whistleblowers' Protection Act ("HWPA"), H.R.S. § 378-62

("Count I"), and wrongfully terminated Plaintiffs in violation of

public policy ("Count II").  First Amended Complaint ¶¶ 42-47.

The First Amended Complaint also asserted three additional claims

against the United States:  (1) intentional infliction of

emotional distress; (2) negligent infliction of emotional

distress; and (3) interference with prospective economic

---

[1] The First Amended Complaint actually alleges claims
against Lee Hayashi and JTSI.  However, because Lee Hayashi was
acting in his official federal employee capacity, the United
States was substituted in place of Lee Hayashi on July 25, 2008.
Thus, in the Second Amended Complaint, all claims are against the
United States and JTSI.

advantage. <u>See</u> <u>id.</u> ¶¶ 48-54. On December 17, 2008, Plaintiffs
filed a Second Amended Complaint, adding a fourth claim against
the United States for negligent hiring, training, and/or
supervision. <u>See</u> Second Amended Complaint ¶¶ 58-61.

On December 24, 2008, JTSI filed its answer to the
Second Amended Complaint. On January 7, 2009, the United States
filed its answer to the Second Amended Complaint.

On March 31, 2009, the United States filed a Motion to
Dismiss ("MTD") pursuant to the discretionary function exception
to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a), and
Fed. R. Civ. P. 12(b)(1). The United States attached to the MTD
the Declaration of Lee Hayashi ("Hayashi Decl."). On July 9,
2009, JTSI filed a Statement of No Opposition[2/] to the MTD. On
the same day, Plaintiffs filed a Memorandum in Opposition to the
MTD ("MTD Opp."), and attached the declaration of their attorney,
Earl Anzai, which authenticates Exhibits 1-5 as true and correct
copies of the original documents. On July 16, 2009, the United
States filed a Reply Memorandum in support of the MTD ("MTD
Reply").

On April 1, 2009, JTSI filed its Second Motion for
Summary Judgment ("MSJ") as to Counts I and II. JTSI also filed

---

[2/] JTSI clarifies in the body of its statement that it is
not opposed to the MTD only on condition that the Court also
grants JTSI's Motion for Summary Judgment. However, no statement
is given as to any other position should the Court decide to deny
the summary judgment motion.

a Separate and Concise Statement of Facts ("MSJ CSF"), attaching the Declaration of H.K. Bruss Keppeler ("Keppeler Decl."), the Vice-President and General Counsel for JTSI, which authenticates Exhibits A-K, and the Declaration of Corianne W. Lau, which authenticates Exhibits L-V. On July 9, 2009, Plaintiffs filed a Memorandum in Opposition to the MSJ ("MSJ Opp."). Plaintiffs also filed a Concise Statement of Facts ("MSJ Opp. CSF"), and attached the Declaration of Michael Jay Green, which authenticates Exhibits 1-8. On July 16, 2009, JTSI filed a Reply Memorandum in support of its MSJ ("MSJ Reply"). JTSI also filed another Concise Statement of Facts ("MSJ Reply CSF"), and attached the Affidavit of Corianne W. Lau, which authenticates Exhibits W-Z and AA-EE.[3]

The Court held a hearing on both the Motion to Dismiss and the Second Motion for Summary Judgment on July 27, 2009.

## FACTUAL BACKGROUND[4]

JTSI is a subcontractor to Science Applications International, Corp. ("SAIC"), a contractor to a prime contract with the United States ("Prime Contract"). Keppeler Decl. ¶ 4. Under the subcontract between JTSI and SAIC ("Subcontract"),

---

[3] JTSI also belatedly filed the Supplemental Affidavit of Corianne W. Lau on July 17, 2009, which authenticates Exhibit FF.

[4] The facts as recited in this Order are for the purpose of disposing of these motions and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

JTSI's obligations included providing security personnel for the Visitor Control Center ("VCC") of the Nimitz-MacArthur Command Center, United States Pacific Command ("PACOM"), Camp H.M. Smith, Hawai'i.[5/] MSJ CSF ¶ 1. Specifically, JTSI personnel supported the United States by providing access control, monitoring security cameras, and issuing clearance badges. MSJ CSF Ex. A, Tab 1 at 1.

The United States retained the authority to control JTSI's performance under the Subcontract. Although JTSI provided the personnel, the United States established all procedures that the JTSI personnel were to follow in performing their security duties at the VCC.[6/] Id. JTSI was strictly forbidden under the

_____

[5/] PACOM is the military headquarters of the Pacific, which consists of the area from the west coast of the United States to the east coast of Africa for all "military-to-military relationships." See MSJ CSF Ex. Q at 13:24-14:5. The VCC is the office responsible for controlling access to PACOM. Id. at 14:8-12. The VCC only opened in 2004, the same year that Plaintiffs were hired. Hayashi Decl. ¶ 4. Up until the opening of the VCC, each respective office within PACOM was responsible for controlling its own access. Id.

[6/] The Statement of Work ("SOW") of the Subcontract states that "[p]olicies and procedures [for the VCC] shall be established by the government for implementation by the contractor." MSJ CSF Ex. A, Tab 1 at 1. JTSI contends that this gave the government "exclusive authority" over VCC policies. MSJ CSF ¶ 2. Plaintiffs, however, contend that nothing in the Subcontract specifically gives the government exclusive authority. MSJ Opp. CSF ¶ 2. To be clear, the United States was exclusively responsible for establishing all the policies and procedures for "the functioning of the contract for the operation of the VCC," as well as the training of VCC personnel. MSJ CSF Ex. Q at 37:4-11, 56:17-25, 57:9-12; see MSJ CSF Ex. A, Tab 1 ¶ 4.6 ("Contractor employees performing services shall be

Statement of Work from performing any "inherently governmental functions," which were defined as "a[ny] function so intimately related to the public interest as to require performance by Federal Government employees," but not "any function that is primarily ministerial and internal in nature."  MSJ CSF Ex. A, Tab 1 at 2.

Lee Hayashi ("Hayashi") was the government official representing the United States as the Command Security Officer at the VCC.  Keppeler Decl. ¶ 10; see Hayashi Decl. ¶ 1; MSJ CSF Ex. Q at 11:13-17.  As the Command Security Officer, Hayashi was responsible for all of the security at PACOM.[7/]  MSJ CSF Ex. Q at 13:10-12.  Hayashi was also the Contracting Officer's Technical Representative ("COTR") on the Subcontract.  Hayashi Decl. ¶ 2. As the COTR, Hayashi was required to oversee the "day-to-day

required to comply with all HQ USPACOM and installation rules and regulations applicable to conduct, safety, security, and procedures governing site entry and exit.").  JTSI, on the other hand, was responsible for establishing its own internal policies; for example, policies regarding the taking of leave and pay periods for its employees working at the VCC.  Id. at 57:1-8, 13-17.

[7/] Specifically, the Command Security Officer is the "[p]rogram manager for the command information security program." MSJ CSF Ex. S ¶ 6.a.  As such, Hayashi was responsible for, among other things, "[d]evelop[ing] policies and procedures for access control as it pertains to access to sensitive and/or classified national security information."  Id. ¶ 6.a.(1).  Hayashi's duties also included "[m]anag[ing] and supervis[ing] the Visitor Control Center," encompassing both the employees of the United States and employees of private contractors that worked at the VCC.  See id. ¶ 6.a.(2); MSJ CSF Ex. Q at 23:20-24:4.

6

administration" of the Subcontract as well as be intimately familiar with its terms and requirements.[8/]  MSJ CSF Ex. Q at 32:2-8, 21-24.  If problems arose that Hayashi could not correct himself as the COTR, he would then contact the contracting officer for further action.  Id. at 33:15-21.

Under the Subcontract, SAIC and the United States reserved the right to inspect all services performed by JTSI. MSJ CSF Ex. A ¶ 1.3; MSJ CSF Ex. Q at 58:5-8.  Further, the Subcontract incorporated Federal Acquisition Regulation ("FAR") clause 52.246-6, 48 C.F.R. § 52.246-6, into the Subcontract.  MSJ CSF Ex. A, Tab 2 at 2, 6.  FAR clause 52.246-6 generally allows the United States to inspect all materials furnished and services performed under the Subcontract, and reserves in the United States the right to require replacement or correction of services rendered or materials delivered.  48 C.F.R. § 52.246-6.  The Subcontract also reserved in SAIC "the right to direct the removal of any individual assigned to this Subcontract."  MSJ CSF Ex. A at 4.

---

[8/] Because the actual contracting officer is likely unfamiliar with the day-to-day administration of the contract or subcontract, the COTR is the technical representative for the contracting officer.  MSJ CSF Ex. Q at 32:19-33:2.  If there is an "issue with the contract," the COTR is the first person who would act on it.  Id. at 32:7-8.  If the COTR could not resolve the issue, he would then go to the contracting officer requesting further action.  Id. at 33:15-21.

Plaintiffs both worked as security personnel for JTSI
at the VCC from 2004-2005.  Sometime before February 10, 2005,
Plaintiff Perdue contacted Ginger Jacobs, JTSI's Human Resource
Manager, to report a potential security violation at the VCC by
Faith Tominaga, one of Plaintiff Perdue's co-workers.  MSJ CSF
Ex. F at 1-2; see also MSJ Opp. CSF Ex. 1 ¶ 4.  Plaintiff Perdue
reported that Tominaga was allowing her boyfriend, Sam Baker,
allegedly a convicted felon, to enter the VCC without clearance
and remain there for Tominaga's entire shift of work.  MSJ CSF
Ex. F. at 1.  In response, Jacobs told Plaintiff Perdue that she
would follow up by looking into the issue.  MSJ CSF Ex. G.

On or about March 19, 2005, Plaintiff Perdue also
contacted Heather Payne, the assistant security officer at the
VCC under Hayashi, regarding the situation with Tominaga and
Baker, as well as other work-related concerns.  MSJ CSF Ex. H.

In fact, Hayashi had already investigated a report of
potential security violations regarding Tominaga and Baker.  On
February 17, 2005, Lucille Alexander, a former VCC employee,
reported potential security violations to Ginger Parales, an
assistant PACOM inspector general.  See MSJ Reply CSF Ex. Z.
Specifically, Alexander reported that Tominaga had made an
unauthorized badge for Baker, and that Baker had been using the

badge and had unescorted access to the building.[9/]  Id.; MSJ CSF

Ex. T at 1; Hayashi Decl. ¶ 8.  On March 8, 2005, Parales

contacted Hayashi regarding Alexander's complaint.  MSJ CSF Ex. T

at 1.  Immediately, Hayashi, Payne, and a disinterested technical

expert initiated an investigation of the complaint.  Id.  The

investigation team reviewed the security system in order to

confirm or deny the allegations of Baker's accessing the system

with his unauthorized badge and of being unescorted in the

building.  Id.  Payne and Hayashi also reviewed closed-circuit

video recordings of the four month period when the alleged

security breaches had occurred.  Id.  The investigation concluded

around one week after Hayashi was informed of the complaint from

Alexander.  See Hayashi Decl. ¶¶ 9, 15.[10/]

     After reviewing all the video tape and security and

computer system logs, the investigation revealed that Baker was

issued a badge, but it was an "uncleared, escort required

badge."[11/]  MSJ CSF Ex. T at 1; MSJ CSF Ex. Q at 97:16-25.

_____

     [9/] Alexander also complained that the VCC had no established
operating procedure for making badges so the VCC personnel
"ma[d]e [their] own rules along the way."  MSJ Reply CSF Ex. Z.

     [10/] The investigation was completed sometime before March 16,
2005 because Hayashi was on leave from March 16 to March 27,
2005.  Hayashi Decl. ¶ 14.

     [11/] This type of badge was frequently issued to family
members and friends of badge holders with clearance to open doors
("hosts") who could act as escorts.  See Hayashi Decl. ¶¶ 5-6
(describing the different types of badges used at the VCC).  JTSI
employees could be hosts in allowing their friends and family

Further, in reviewing the security system access logs, the investigation revealed that Baker did not have access to the security system, and was not handing out badges to military personnel from behind the desk. MSJ CSF Ex. T at 1; MSJ CSF Ex. Q at 97:1-5. Further, Baker did not have unescorted access to the building. MSJ CSF Ex. Q at 103:13-104:3. However, the investigation did reveal that Baker had been behind the VCC desk on several occasions, and appeared to have been using the VCC computer to play video games, all of which was improper. Id. at 93:2-94:18. As a result, Hayashi determined that Tominaga "violated the rules" in allowing Baker to sit behind the VCC desk and use the VCC computer, but also determined that no breach of security had resulted. Hayashi Decl. ¶ 13.

On or about March 24, 2005, Plaintiff Perdue viewed a copy of a video surveillance tape[12] depicting Baker, and other

_____

into the VCC itself, but did not have the clearance to open doors for the rest of PACOM. See id. ¶ 6.

[12] Plaintiffs assert that Hayashi never reviewed this videotape because he was on leave from March 16-27, 2005, and the footage was taken on or about March 19, 2005. MSJ Opp. at 3; MSJ Opp. CSF Ex. 7 ¶ 4. However, Hayashi testified that this videotape was in fact the video that he had compiled in his investigation of Alexander's complaint. MSJ CSF Ex. Q at 116:18-23, 122:18-19, 156:9-14; see MSJ Reply CSF Ex. X. Regardless, this issue only goes to the sufficiency of Hayashi's investigation and the basis for his decision to remove Plaintiffs. The Court need not determine such sufficiency and basis in finding the applicability of the discretionary function exception to the United States and the government contractor defense to JTSI.

friends of Tominaga, in the VCC and using a computer.  MSJ Opp.
CSF ¶ 7-8.  On March 25, 2005, Plaintiff Perdue showed the video
to Plaintiff Griffin, and Plaintiff Griffin agreed that Tominaga
and Baker were committing security violations.[13/]  Id. ¶¶ 9-10.

On March 24 or 25, 2005, Plaintiff Perdue contacted
Dana Oania, Jacobs's replacement as JTSI's human resource
manager, and spoke to her on the phone regarding what Plaintiffs
had seen on the video.  MSJ CSF Ex. N at 10.  Oania stated that
she was not sure how to handle the problem, but in the meantime,
she arranged a meeting with Plaintiffs and a third JTSI employee,
Travis Goodwin for April 1, 2005.  Id.

Sometime around March 25, 2005, Plaintiff Griffin,
along with Goodwin, met with Payne to show her the videotape and
discuss the security concerns.  MSJ CSF Ex. L at 59:1-9.  Payne
responded by stating that Hayashi would set up a meeting with all
the VCC personnel.[14/]  Id.

---

[13/] Plaintiff Griffin also informed Plaintiff Perdue that he
had seen Baker using the VCC security computers in the past, and
that there had been recent accesses on Baker's badge, which Baker
was not allegedly authorized to have.  MSJ CSF Ex. H at 1.

[14/] In fact, Hayashi had already completed his investigation
of Alexander's complaint at this point.  Further, JTSI had also
received numerous other complaints from various VCC personnel,
only some of which had been passed on to Hayashi and Payne.  See
MSJ CSF Ex. T at 1.  Apparently, "two factions of VCC personnel"
existed and "one faction was making allegations against the
other."  Id.  Neither Hayashi nor JTSI had been able to
corroborate any of the allegations submitted in the complaints
entered up until that point.  Id.

On March 29, 2005, Hayashi, Payne, and Ron Jarrett, the vice president for JTSI, met with all the VCC personnel to discuss the recent investigation, as well as the other complaints and apparent personality clashes at the VCC. MSJ CSF Ex. T at 2; MSJ CSF Ex. Q at 157:17-25. In the meeting, Hayashi explained that he was aware of the alleged security violations.[15] Hayashi Decl. ¶ 15; MSJ CSF Ex. M at 88:2-89:7. Hayashi also discussed the results of his investigation into Alexander's complaint (apparently without mentioning the names of Alexander, Tominaga, or Baker) and stated that although family and friends were welcome at the VCC, from now on, the policy would be that only VCC personnel could be behind the desk. Id.; MSJ CSF Ex. T at 2. Hayashi explained that potential security breaches needed to be reported to him directly so that they could be dealt with immediately.[16] MSJ CSF Ex. T at 2; Hayashi Decl. ¶ 15.

After speaking about the allegations of security violations, Hayashi noted the need for mutual trust among VCC personnel in a collaborative work environment and that given their small numbers (eight individuals), it was imperative that

_____

[15] Hayashi further explained, without mentioning her name, that Tominaga would not be reprimanded other than by implementing the new policy forbidding family members and friends behind the VCC desk. MSJ CSF Ex. Q 95:1-7.

[16] Thus, Hayashi expressed his concern that Alexander (who he did not name) had complained to the inspector general's office instead of to him directly. MSJ CSF Ex. T at 2; Hayashi Decl. ¶ 15.

they work together as a team.[17/]  MSJ CSF Ex. T at 2.  Plaintiffs

claim that Hayashi also stated to the group that he could have

their security clearances revoked at anytime, that this job is

not for everyone, and that if they did not comply, they should

seek employment elsewhere.  MSJ CSF Ex. L at 62:9-15, Ex. M at

89:12-16.  Finally, Hayashi invited anyone with questions or

concerns to speak with him on an individual basis.  MSJ CSF Ex. T

at 3; Hayashi Decl. ¶ 16.  The Plaintiffs never contacted Hayashi

after the meeting or at any later point about what was discussed.

MSJ CSF Ex. Q at 163:1-6.

        Dissatisfied with Hayashi's statements, Plaintiffs,

along with Goodwin, approached Jarrett after the meeting,

expressing their concerns to him and explaining the contents of

the video.  MSJ Opp. CSF Ex. 1 at ¶ 16; MSJ CSF Ex. N at 10-11.

Jarrett responded by stating that JTSI's responsibility was

simply to report the matter to the United States.  MSJ Ex. P at

66:14-16.

        Feeling their concerns were falling on deaf ears,

Plaintiffs continued to report the alleged security violations of

Tominaga and Baker to several other security officials.  On March

30, 2005, Plaintiff Perdue reported the alleged security

---

[17/] Hayashi also expressed his no tolerance policy for sexual
harassment, racial issues, or any other mistreatment (for which
there had been allegations among VCC personnel).  MSJ CSF Ex. T
at 2.

violations to the Army Criminal Investigations Division's 1st
Sergeant Ahn. MSJ Opp. CSF Ex. 1 at ¶¶ 18-21; MSJ CSF Ex. N at
11. Ahn referred the matter to Kenny Wheeler of the Naval
Criminal Investigative Service ("NCIS") because the VCC is part
of a Navy installation. Id. Wheeler then referred the matter to
the Provost Marshal's Office ("PMO"), which in turn referred the
matter to Guy Dunan of the PACOM Security Office. Id. None of
the Army Criminal Investigations Division, NCIS, or the PMO were
in Hayashi's chain of command. Hayashi Decl. ¶ 19.

        Meanwhile, Plaintiff Griffin reported the violation to
Lieutenant Schnaproff on March 29, 2005, following the VCC
meeting. MSJ CSF Ex. L at 118:22-121:23. Lieutenant Schnaproff
stated that he would investigate the matter and get back to
Plaintiff Griffin. Id. Apparently Plaintiff Griffin believed
that Schnaproff was in Hayashi's direct line of command. MSJ
CSF Ex. L at 121:20-23. In fact, Schnaproff was not in Hayashi's
line of command. MSJ CSF Ex. Q 165:3-7; Hayashi Decl. ¶ 17.

        On March 31, 2005, Colonel Pate (Schnaproff's direct
boss) met with Hayashi to inform him that Plaintiff Griffin had
reported potential security violations identical to the
allegations that Hayashi thought were resolved at the VCC
meeting. See MSJ CSF Ex. T at 3; Ex. Q at 164:5-17. Believing
that there was a breach of trust, Hayashi inquired with the VCC
personnel on duty at that time (not Plaintiffs or Tominaga) as to

whether he had been clear at the VCC meeting that there had been a full investigation and that any further concerns should be addressed to him directly. Hayashi Decl. ¶ 17. The three on-duty personnel confirmed that the message of the meeting was clear. MSF CSF Ex. T at 3.

Hayashi then spoke with Jarrett as to whether he had been clear at the meeting. Hayashi Decl. ¶ 18. Jarrett also confirmed that the message was clear. Id. After a brief discussion, Hayashi requested that Plaintiff Griffin be removed from work at the VCC because he could no longer be trusted.[18/] Hayashi Decl. ¶ 18; MSJ CSF Ex. Q at 167:16-17.

Later the same day, Hayashi was contacted by the PMO regarding Plaintiff Perdue's complaint that was referred to them by the NCIS. MSJ CSF Ex. Q at 168:1-14. After determining that Plaintiff Perdue's complaint was identical to that of Plaintiff Griffin's, Hayashi again called Jarrett, this time requesting that Plaintiff Perdue be removed from work at the VCC. Id. at 169:13-15. Hayashi then sent an e-mail to Jarrett, to formally request that Plaintiffs be removed immediately from their positions at the VCC.[19/] MSJ CSF Ex. I at 1.

---

[18/] This was the first time that JTSI was made aware of any reporting of the security violations by Plaintiffs after the March 29 VCC meeting. Keppeler Decl. ¶ 18.

[19/] Hayashi had requested on several previous occasions that JTSI remove personnel from work at the VCC for various reasons. MSJ CSF Ex. Q at 25:12-23, 50:11-13. JTSI had apparently always

On April 1, 2005, Plaintiffs and Mr. Goodwin met with Oania as scheduled. MSJ CSF Ex. N at 12. In their meeting, however, Oania informed Plaintiffs that they were being removed from the Subcontract at the government's request, and that JTSI had to comply or else risk losing the Subcontract. <u>Id.</u> Furthermore, because JTSI did not have any open positions elsewhere, Plaintiffs were terminated. <u>Id.</u> Goodwin, however, was not terminated. Keppeler Decl. ¶ 17. Plaintiffs later learned that JTSI had hired replacements to fill their positions. Second Amended Complaint ¶¶ 38-39.

**DISCUSSION**

**I.    The United States's Motion to Dismiss for Lack of Subject Matter Jurisdiction**

**A.    Standard**

A court's subject matter jurisdiction may be challenged under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"). Generally, "[a] party invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction." <u>See</u> <u>Thompson v. McCombe</u>, 99 F.3d 352, 353 (9th Cir. 1996). However, where a Rule 12(b)(1) motion is filed for lack of subject matter jurisdiction pursuant to the discretionary

---

complied with Hayashi's request. <u>See</u> <u>id.</u> Had JTSI refused to remove a VCC personnel at Hayashi's request, Hayashi's next course of action would have been to request that the contractor (SAIC) inform JTSI that the VCC personnel needed to be removed per the United States's request, or otherwise be in default. <u>Id.</u> at 56:6-11.

function exception to the FTCA, "[t]he United States bears the burden of proving the applicability of the discretionary function exception." Terbush v. United States, 516 F.3d 1125, 1128 (9th Cir. 2008).

On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court is not "restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988). "Once the moving party [converts] the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." Savage v. Glendale Union High Sch., 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

"The requirement that the nonmoving party present evidence outside his pleadings in opposition to a motion to dismiss for lack of subject matter jurisdiction is the same as that required under Rule 56(e) that the nonmoving party to a motion for summary judgment must set forth specific facts, beyond his pleadings, to show that a genuine issue of material fact exists." Trentacosta v. Frontier Pac. Aircraft Indus., Inc., 813 F.2d 1553, 1559 (9th Cir. 1987). When ruling on a jurisdictional

motion involving factual issues which also go to the merits, the
moving party "should prevail only if the material jurisdictional
facts are not in dispute and the moving party is entitled to
prevail as a matter of law." <u>Casumpang v. Int'l Longshoremen's &
Warehousemen's Union</u>, 269 F.3d 1042, 1060-61 (9th Cir. 2001).

**B.    Analysis**

The United States moves this Court for dismissal on the
basis that it is immune from liability on any actions by Hayashi
(that give rise to Plaintiffs' claims) under the discretionary
function exception to the FTCA.  Plaintiffs counter that the
exception does not apply because Hayashi's decision to remove
Plaintiffs from the VCC was directly contrary to a federal
regulation.  The Court finds that the regulation cited by
Plaintiffs is inapplicable to these facts, and further finds that
Hayashi did have a choice in deciding whether to remove
Plaintiffs.  Finally, the Court finds that the discretionary
function exception is applicable to this type of decision.

"Unless Congress enacts legislation that subjects the
federal government to tort liability, the United States, as
sovereign, cannot be sued."  <u>Marley v. United States</u>, 567 F.3d
1030, 1034 (9th Cir. 2009).  The FTCA, 28 U.S.C. §§ 1346(b) and
2671 <u>et seq.</u>, is an example of specific legislation that waives

the federal government's immunity in certain tort cases.[20/]  <u>See</u>
<u>Marley</u>, 567 F.3d at 1034.  However, the FTCA lists several
exceptions to this limited waiver of immunity.  The relevant
exception to the instant dispute states that the waiver of tort
immunity under the FTCA is not applicable to "[a]ny claim . . .
based upon the exercise or performance or the failure to exercise
or perform a discretionary function or duty on the part of a
federal agency or an employee of the Government, whether or not
the discretion involved be abused."  28 U.S.C. § 2680(a).  The
United States argues that this discretionary function exception
applies to Hayashi's decision to remove Plaintiffs from the VCC.

        The Supreme Court has articulated a two-prong test that
must be met in order for the discretionary function exception to
apply.  <u>See</u> <u>Berkovitz v. United States</u>, 486 U.S. 531, 536-37
(1988); <u>United States v. Gaubert</u>, 499 U.S. 315, 322-23 (1991).
"In examining the nature of the challenged conduct, a court must
first consider whether the action is a matter of choice for the
acting employee."  <u>Berkovitz</u>, 486 U.S. at 536.  In other words,
there must be actual discretion to act on the part of the federal

---

        [20/] In applying the FTCA and its exceptions, the Court is
cognizant of the motivations for enacting the FTCA.  "[T]he FTCA
was created by Congress with the intent 'to compensate
individuals harmed by government negligence,' and as a 'remedial
statute,' it 'should be construed liberally, and its exceptions
should be read narrowly.'"  <u>Terbush</u>, 516 F.3d at 1135 (quoting
<u>O'Toole v. United States</u>, 295 F.3d 1029, 1037 (9th Cir. 2002)).

19

employee.[21/]  See id.  Such discretion is nonexistent "when a
federal statute, regulation, or policy specifically prescribes a
course of action for an employee to follow."  Id.  "If there is
such a statute or policy directing mandatory and specific action,
the inquiry comes to an end because there can be no element of
discretion when an employee 'has no rightful option but to adhere
to the directive.'"  Terbush, 516 F.3d at 1129 (quoting
Berkovitz, 486 U.S. at 536).

        Second, "assuming the challenged conduct involves an
element of judgment, a court must determine whether that judgment
is of the kind that the discretionary function exception was
designed to shield."  Id.  In other words, the decision made, and
action taken, must be grounded in policy:

> Because the purpose of the exception is to "prevent
> judicial  'second-guessing'  of  legislative  and
> administrative decisions grounded in social, economic,
> and political policy through the medium of an action in
> tort," when properly construed, the exception "protects
> only  governmental  actions  and  decisions  based  on
> considerations of public policy."

Gaubert, 499 U.S. at 323 (quoting Berkovitz, 486 U.S. at 537)
(internal citations omitted).  If these two prongs are met, the
discretionary function exception applies and the United States is

---

        [21/] The Supreme Court also emphasized that the inquiry
focuses on the conduct itself, not the individual actor, when
determining whether there was actual judgment or choice.  See
Berkovitz, 486 U.S. at 536 ("'[I]t is the nature of the conduct,
rather than the status of the actor, that governs whether the
discretionary function exception applies in a given case.'"
(quoting United States v. Varig, 467 U.S. 797, 813 (1984))).

immune from tort liability.  To determine the applicability of
this test to the instant matter, the Court will address each
prong in turn.

### 1. Lee Hayashi had Discretion in his Decision to Remove Plaintiffs from the VCC.

Plaintiffs' main opposition to the instant MTD centers
around the argument that Hayashi did not have the discretion to
remove Plaintiffs because such conduct violated a regulation, 32
C.F.R. § 145.3, which forbids personnel actions taken against
whistleblowers.  See MTD Opp. at 8-9.  As noted above, the first
prong of the Berkovitz test is not met if a regulation
"prescribes a course of action" because actual discretion would
then be absent.  See Berkovitz, 486 U.S. at 536.  Here, however,
the relevant regulation does not even apply to the instant facts
and Plaintiffs argue no other reason why Hayashi would not have
discretion to remove them from the VCC.

The pertinent regulation, 32 C.F.R. § 145.3, applies to
personnel actions taken by Department of Defense employees, and
forbids such individuals from "tak[ing] or fail[ing] to take a
personnel action with respect to any employee or applicant for
employment as a reprisal for being a whistleblower."  32 C.F.R. §
145.3, Prohibited personnel practice, subsection (h).  At first
blush, this regulation might appear to be applicable to the
instant facts.  However, the regulation further defines the term
"whistleblower" in relevant part as "[a] present or former

21

Federal employee or applicant for Federal employment who

discloses information he or she reasonably believes evidences . .

. [a] violation of any law, rule, or regulation." Id.,

Whistleblower, subsection (a) (emphasis added).

The United States argues, and the Court agrees, that

this regulation does not apply here because Plaintiffs are not

federal employees. MTD Reply at 3-4. Plaintiffs fail to even

address the fact that this regulation only applies to actions

taken against federal employees.[22/] Further, Plaintiffs do not

argue that they are in fact federal employees.[23/] Indeed, the

Subcontract's terms are clear that JTSI (and thus Plaintiffs) are

not employees of either SAIC or the United States. See MTD Opp.

Ex. 2 at 8, section 13.0 ("The Subcontractor is not an employee

of SAIC for any purpose whatsoever. [JTSI] agrees that in all

matters relating to this Subcontract it shall be acting as an

independent contractor . . . . [JTSI] shall have no right,

power, or authority to create any obligation, expressed or

implied, on behalf of [SAIC] and/or the Government . . . .").

_____

[22/] Although Plaintiffs cite to the initial section of the
regulation prohibiting personnel actions taken against
whistleblowers, Plaintiffs do not cite to the section of the
regulation, just four paragraphs later, that requires the
whistleblower to be a federal employee. See MTD Opp. at 9.

[23/] To the contrary, Plaintiffs do not appear to dispute
that, in fact, they "were employed by JTSI," which is a
subcontractor of SAIC. See MTD Opp. at 3-4.

Moreover, independent contractors are generally not employees of the federal government under the Civil Service Reform Act, the law under with the instant regulation was promulgated. See 32 C.F.R. § 145.1 ("[P]art [145] establishes policy, assigns responsibilities, and prescribes procedures for cooperation with the Office of Special Counsel (OSC) of the Merit Systems Protection Board (MSPB) in fulfilling the responsibilities of the Special Counsel under Pub.L. 95-454 [(The Civil Service Reform Act)]"); Thompson v. Merit Sys. Prot. Bd., 421 F.3d 1336, 1338 (Fed. Cir. 2005) (holding that under the Civil Service Reform Act, the term "employee" refers to "only federal employees, and not contractors or employees of contractors"). Thus the Court finds that Hayashi's actions were not regulated by 32 C.F.R. § 145.3.

"When a specific course of action is not prescribed [by a statute, regulation, or policy], an element of choice or judgment is likely involved in the decision or action." Terbush, 516 F.3d at 1129. Here, the relevant actions that give rise to all of Plaintiffs' claims are Hayashi's decision to remove Plaintiffs from the VCC (Counts I-V) and the United States's hiring, training, and supervising of Hayashi and other managerial staff (Count VI). See Second Amended Complaint ¶¶ 45-61. All of these actions relate to either personnel actions taken by the United States on its own federal employees (i.e., Hayashi), or

23

personnel actions taken by Hayashi with regard to Plaintiffs. The Court finds that all of these decisions are inherently discretionary.

In general, decisions regarding personnel actions by employers "are precisely the types of administrative action the discretionary function exception seeks to shield from judicial second-guessing." See Richman v. Straley, 48 F.3d 1139, 1147 (10th Cir. 1995); Vickers v. United States, 228 F.3d 944, 950 (9th Cir. 2000) ("This court and others have held that decisions relating to the hiring, training and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield."); Crete v. City of Lowell, 418 F.3d 54, 64 (1st Cir. 2005) ("[U]niformly[,] the federal circuit courts under the FTCA have found that employer decisions such as hiring, discipline, and termination of employees are within the discretionary function exception.").

Specifically, with regard to the first prong of the Berkovitz test, personnel decisions are "inherently discretionary, especially where, as here, the relevant statutes provide no guidance or restrictions." See Richman, 48 F.3d at 1146. Regardless of whether Plaintiffs believe they were wrongfully terminated because they were attempting to report security breaches, the United States had a choice of personnel actions and was not directed by any statute, regulation, or

policy to take any specific action with regard to Plaintiffs.[24/]
See Sydnes v. United States, 523 F.3d 1179, 1185 (10th Cir. 2008)
(finding that the first prong of the Berkovitz test is satisfied
"even assuming that plaintiffs were fired in retaliation for
reporting security breaches"); see also 28 U.S.C. § 2680(a)
(discretionary function applies even if discretion is abused);
Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1140 (10th
Cir. 1999) (holding that Gaubert and other Supreme Court cases
"bar any FTCA claim for which jurisdiction necessarily depends on
an employee's bad faith or state of mind in performing facially
authorized acts").

---

[24/] Plaintiffs argue that, even if Hayashi's actions were not
limited by a specific regulation, his actions were "limited . . .
assuredly by a federal policy." MTD Opp. at 9. However,
Plaintiffs do not cite to what that actual policy might be. At
the hearing, the Court inquired further as to whether the
Plaintiffs could elaborate on what specific federal policy they
were referring to; Plaintiffs responded that they could not.
Thus, the Court finds that there is no policy that prescribed the
United States's actions in this case. See Sydnes, 523 F.3d at
1185 ("[G]iven the apparent lack of constraining regulations in
federal law identified by plaintiffs, we can only conclude that
staffing decisions related to the hiring and firing of civilian
contractors at [the contracting company] were left to the
discretion of [federal government] officials.").
    To the extent that Plaintiffs may be arguing that the United
States's actions were prescribed by state public policy, the
discretionary function exception would still apply because there
is no federal policy directing the United States's actions. See
id. at 1184 (where the plaintiffs argued that state policy
limited the federal government's discretion, the court held that
"the only conceivable way plaintiffs might succeed on th[is]
theory is by pointing to a federal policy incorporating state
tort law as a limit on the discretion of federal employees").

Therefore, the Court finds that the United States had discretion as to what personnel actions to take at the VCC, including the training and supervision of both federal and contractor employees at the VCC,[25/] as well as the removal of Plaintiffs.[26/]  Accordingly, the first prong of the <u>Berkovitz</u> test is satisfied.

### 2.  Hayashi's Actions were Based on Policy Decisions.

Having found that the United States had discretion in its personnel actions in the instant matter, the Court turns to the second prong of the <u>Berkovitz</u> test.  "[F]or a complaint to survive a motion to dismiss [on the second <u>Berkovitz</u> prong], [the complaint] must 'allege facts which would support a finding that the challenged actions are not the <u>kind of conduct</u> that can be said to be grounded in the policy of the regulatory regime.'" <u>Terbush</u>, 516 F.3d at 1130 (quoting <u>Gaubert</u>, 499 U.S. at 324-25) (emphasis added).  In other words, "[t]he focus of the inquiry is . . . on the nature of the actions taken and on whether they are susceptible to policy analysis."  <u>Gaubert</u>, 499 U.S. at 325.

---

[25/] The Court notes that as to Claim VI for negligent hiring, training, and/or supervision, Plaintiffs have not presented any evidence of facts supporting this claim.  Even assuming evidence was presented that tended to support the claim, the Court would still determine that hiring, training, and supervising are all discretionary personnel decisions.  <u>See</u> <u>Sydnes</u>, 523 F.3d at 1185.

[26/] It is irrelevant whether the United States abused that discretion in any way as the discretionary function exception applies "whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

Therefore, in applying the second prong to the instant

facts, the Court:

> do[es] not inquire into the intent of the government
> supervisor when making a specific personnel decision, and
> neither do[es] [the Court] ask whether policy analysis is
> the actual reason for the decision in question.  Instead,
> [the Court] operate[s] at a higher level of generality .
> . . , asking categorically (rather than case
> specifically) whether the kind of conduct at issue can be
> based on policy concerns.

Sydnes, 523 F.3d at 1185 (internal citations and quotations

omitted).  Thus, for purposes of determining the satisfaction of

the second prong, it is irrelevant what the United States's

actual motivations were for the personnel actions taken against

Plaintiffs.

The Court finds the Tenth Circuit's analysis of this

second prong to be particularly instructive as it was applied by

that Circuit in a factually similar case.  See id. at 1185-87.

In Sydnes, two employees of a government contractor brought a

tort action against the contractor and the United States,

alleging that they were wrongfully terminated for reporting

alleged security breaches.[27/]  Id. at 1182.  In its motion for

_____

[27/] There are striking similarities between the facts in
Sydnes and the instant case.  In Sydnes, the contractor was hired
to provide technical support services to the United States
Northern Command at a facility called the Joint Communications
Support Center.  523 F.3d at 1181.  One of the plaintiffs, who
were both contractor employees, observed a government employee
providing a cryptograph key to a civilian (who was not authorized
to have the key) that would allow the civilian access to
classified information if improperly used.  Id. at 1182.  After
discussing this incident with the other plaintiff, together they

summary judgment, the United States argued that the discretionary function exception of the FTCA applied to the United States's actions in the matter.  <u>Id.</u>  The district court agreed and granted the motion.  <u>Id.</u>

Affirming the district court's decision, the Tenth Circuit found that the first <u>Berkovitz</u> prong was satisfied because, as the Court has also found here, the United States had wide discretion in personnel decisions and the plaintiffs were unable to point to any federal statute, regulation, or policy that would limit that discretion in any way.  <u>Id.</u> at 1184-85.

Turning then to the second prong, the Tenth Circuit held that the "kind of conduct" involved in the case (namely, employment personnel decisions) requires the type of policy analysis that the discretionary function exception was specifically enacted to protect.  <u>Id.</u> at 1185-86.  The Tenth Circuit explained:

> [E]mployment and termination decisions are, as a class, the kind of matters requiring consideration of a wide range of policy factors, including "budgetary

decided to report what they felt was a potential security breach.  <u>Id.</u>  The plaintiffs proceeded to report the incident both to an individual with their employer (the contractor) and to a government official.  <u>Id.</u>  When the United States official in charge of the Joint Communications Support Center heard indirectly about the plaintiffs' reporting, he was upset that plaintiffs had not reported directly to him.  <u>Id.</u>  Finally, just over a week after their initial reporting, the government official in charge of the center requested that the plaintiffs be removed from employment based on concerns that they were hindering the teamwork that was necessary at the center.  <u>Id.</u>

constraints, public perception, economic conditions, individual backgrounds, office diversity, experience and employer intuition."

Id. at 1186 (quoting Burkhart v. Washington Metro. Area Transit Auth., 112 F.3d 1207, 1217 (D.C. Cir. 1997)).  Thus, the Tenth Circuit held that both prongs of the Berkovitz test were met and the United States was immune from suit:

A federal agency's decision to terminate or request the termination of an employee involves an element of choice and is the kind of decision that implicates policy concerns relating to accomplishing the agency's mission.

Id. at 1187.[28/]

The Court similarly finds that personnel decisions with regard to security staff at the VCC involve the consideration of a variety of policy factors, including, national security and security of the PACOM, financial and budgetary considerations, the backgrounds of employees and potential employees, and the ability of VCC staff to work effectively with each other and all other military government officials who utilize and rely on the VCC.  Even assuming Hayashi abused his discretion in directing Plaintiffs' removal from the VCC, this type of personnel decision is susceptible to policy analysis.  Thus, the Court finds that the second Berkovitz prong is also satisfied here and the United

_____

[28/] The Court notes that Plaintiffs do not even address the holding in Sydnes, let alone attempt to distinguish it, despite the lengthy analysis of the case by the United States in the MTD.

29

States has met its burden of proving the applicability of the discretionary function exception.

Accordingly, the Court grants the United States's Motion to Dismiss because the United States has not waived its sovereign immunity in this matter.[29/]  All claims brought solely against the United States (Counts III-VI) are therefore dismissed.  Thus, only Counts I and II against JTSI remain, pending the Court's determination of JTSI's Second Motion for Summary Judgment.

## II.  JTSI's Second Motion for Summary Judgment

### A.  Standard

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A

_____

[29/] Because the Court grants the Motion to Dismiss pursuant to the discretionary function exception, it is unnecessary to address the United States's alternative ground for dismissal under the interference with contract rights exception to the FTCA.

30

'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal citation omitted).[30/] Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Miller v. Glenn Miller Productions, 454 F.3d 975, 987 (9th Cir. 2006). The moving party may do so with affirmative evidence or by "'showing'--that is pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.[31/]

_____

[30/] Disputes as to immaterial issues of fact do "not preclude summary judgment." Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

[31/] When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial. Miller, 454 F.3d at 987 (quoting C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc., 213 F.3d 474, 480 (9th Cir. 2000)). When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See Celotex, 477 U.S. 323; Matsushita Elec., 475 U.S. at 586; Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).[32/]  The nonmoving party must instead set forth "significant probative evidence" in support of its position.  T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.  See T.W. Elec. Serv., 809 F.2d at 630-31.[33/]  Accordingly, if

judgment by pointing out to the court an absence of evidence from the nonmoving party.  Miller, 454 F.3d at 987.

[32/] Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

[33/] At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.  Anderson, 477 U.S. at 249; Bator v. State of Hawaii, 39 F.3d 1021, 1026 (9th Cir. 1994).

"reasonable minds could differ as to the import of the evidence,"
summary judgment will be denied.  <u>Anderson</u>, 477 U.S. at 250-51.

**B.   Analysis**

As it did in its First Motion for Summary Judgment,
JTSI asserts that the government contractor defense shields JTSI
from liability.  MSJ at 17.  In the Order on the First Motion for
Summary Judgment, the Court denied the motion on the basis that
questions of fact existed as to whether the United States had
established reasonably precise specifications with regard to
JTSI's performance under the contract, and with regard to the
removal of Plaintiffs from work at the VCC.  <u>See</u> First MSJ Order
at 31.  The Court was particularly concerned with the fact that
essentially the only evidence of the United States's involvement
with both performance under the Subcontract, and Plaintiffs'
ultimate removal, was the e-mail sent by Hayashi to Jarrett
requesting such removal.  <u>Id.</u> at 34.

In the instant MSJ, JTSI has provided the Court with a
substantial amount of new evidence (most notably, the deposition
of Hayashi) shedding light on the United States's role in the
administration of the Subcontract with JTSI, as well as a
detailed account of the United States's role in the determination
to remove Plaintiffs from the VCC.  Because this evidence
directly addresses the reason for the Court's denial of the First
Motion for Summary Judgment, it is appropriate to consider the

instant MSJ. See Lexicon, Inc. v. Safeco Ins. Co. of Am., 436
F.3d 662, 670 n.6 (6th Cir. 2006) ("'[D]istrict courts may in
their discretion permit renewed or successive motions for summary
judgment, particularly when the moving party has expanded the
factual record on which summary judgment is sought.'" (quoting
Kovacevich v. Kent State Univ., 224 F.3d 806, 835 (6th Cir.
2000))). The Court will briefly review the relevant law[34/] and
will then address the applicability of the government contractor
defense to the facts as they are now presented.

As an initial matter, the government contractor defense
precludes liability where "a 'significant conflict' exists"
between federal and state law in areas of "uniquely federal
interests." Boyle v. United Technologies Corp., 487 U.S. 500,
507 (1988) (quoting Wallis v. Pan Am. Petroleum Corp., 384 U.S.
63, 68 (1966)). Where an independent contractor's[35/] liability to
a third party under a government contract is the subject of the
suit, it is true that the United States's obligation under the
contract is not directly at issue. Id. at 505. However, in such
a situation, whether the suit seeks liability against the United

_____

[34/] A more in-depth discussion of the background of the
government contractor defense can be found in the Court's First
MSJ Order. See First MSJ Order at 30-37.

[35/] Subcontractors are afforded the same protections under
the government contractor defense as prime contractors. See,
e.g., Maquire v. Hughes Aircraft Corp., 912 F.2d 67 (3d. Cir.
1990) (finding that a subcontractor satisfied the requirements of
Boyle and was thus shielded from liability).

States directly, or against its contractor for work under the
contract, "there is obviously implicated the same interest in
getting the Government's work done." Id. Thus, "the liability
of independent contractors performing work for the Federal
Government, like the liability of federal officials, is an area
of uniquely federal interest." Id. at 505 n.1.

Once it has been determined that a uniquely federal
interest is involved, the government contractor defense will
apply where the following three prongs are satisfied:

> (1) the United States approved reasonably precise
> specifications; (2) the equipment conformed to those
> specifications; and (3) the supplier warned the United
> States about the dangers in the use of the equipment that
> were known to the supplier but not to the United States.

Id. at 512 (adopting the standards of the Fourth and Ninth
Circuits). Although this standard applies more directly to
procurement contracts involving government equipment, there
is "no basis for a distinction" between procurement and
performance contracts in applying the government contractor
defense.[36/] Id. at 506. In fact, one of the early cases on

---

[36/] The Ninth Circuit's application of the defense has been
limited to contracts involving specifications for the design or
production of military equipment or operation of military
facilities. See, e.g., In re Hanford Nuclear Reservation
Litigation, 534 F.3d 986 (9th Cir. 2008) (discussing the defense,
but ultimately refusing to apply the defense to a plutonium
production facility that assisted in production of the atomic
bombs used in World War II); Snell v. Bell Helicopter Textron,
Inc., 107 F.3d 744 (9th Cir. 1997) (question of fact precluded
application of the defense to specifications for manufacturing of
Marine Corps helicopters); Butler v. Ingalls Shipbuilding, Inc.,

which <u>Boyle</u> relied in explaining the origins of the defense

was a performance contract.  <u>Id.</u> at 506; <u>see</u> <u>Yearsley v.</u>

<u>W.A. Ross Const. Co.</u>, 309 U.S. 18, 20-21 (1940) (holding

that the government contractor defense protected a

construction contractor from liability for erosion caused by

its building of dikes under a government contract).

The Court finds that the Subcontract involves a

uniquely federal interest because the services contracted

for could have been performed by federal officials, and in

fact, are still supervised directly by federal officials.

<u>See</u> <u>Boyle</u>, 487 U.S. at 505.  More specifically, the

Subcontract is for security services at a military

installation, which implicates concerns of national

security, surely a uniquely federal interest.  <u>See</u> <u>Am. Pipe</u>

---

89 F.3d 582 (9th Cir. 1996) (defense applies to design
specifications of Navy accommodation ladder); <u>In re Hawaii</u>
<u>Federal Asbestos Cases</u>, 960 F.2d 806 (9th Cir. 1992) (defense
does not apply to manufacturing specifications of asbestos
insulation sold to the Navy); <u>McKay v. Rockwell Int'l Corp.</u>, 704
F.2d 444 (9th Cir. 1983) (defense applies to design
specifications of the escape system on Navy aircraft).  However,
the language of these cases does not limit the application of the
defense to procurement contracts alone.  <u>See, e.g.</u>, <u>Hanford</u>, 534
F.3d at 1000 ("The defense allows a contractor-defendant to
receive the benefits of sovereign immunity when a contractor
complies with the specifications of a federal government
contract."); <u>McKay</u>, 704 F.2d at 448 (citing to <u>Yearsley</u> and
explaining that the government contractor defense "protects a
government contractor from liability for acts done by him while
complying with government specifications during execution of
performance of a contract with the United States").  Thus, the
Court finds that there is no reason why the defense should not
also apply to performance contracts.

& Steel Corp. v. Firestone Tire & Rubber Co., 292 F.2d 640,
644 (9th Cir. 1961) ("[T]he construction of subcontracts,
let under prime contracts connected with the national
security, should be regulated by a uniform federal law.").
Thus, the imposition of state law would have a significant
conflict with this federal interest.

Having found that the Subcontract implicates
uniquely federal interests, the Court will address the
application of the three-prong test for the government
contractor defense to the instant facts.

### 1. The United States Approved Reasonably Precise Specifications.

In order to satisfy the first prong of the test,
the United States must be intimately involved in the
development of specifications guiding the performance of the
contractor. See McKay, 704 F.2d at 450 ("When only minimal
or very general requirements are set for the contractor by
the United States the [government contractor] rule is
inapplicable. The situation is different where the United
States reviewed and approved a detailed set of
specifications."). "Government approval 'requires more than
a rubber stamp.'" Snell, 107 F.3d at 748 (quoting Trevino
v. General Dynamics Corp., 865 F.2d 1474, 1480 (5th Cir.
1989)). In other words, there must be a "'back and forth
dialogue culminating in approval,' and '[a] continuous

exchange between the contractor and the government' . . .
[in order] to satisfy <u>Boyle</u>'s first condition." <u>Butler v.
Ingalls Shipbuilding, Inc.</u>, 89 F.3d 582, 585 (9th Cir. 1986)
(quoting <u>Tate v. Boeing Helicopters</u>, 55 F.3d 1150, 1156 (6th
Cir. 1995)).

In the First MSJ Order, JTSI argued that Hayashi's
e-mail request for Plaintiffs' removal sufficed on its own
to satisfy the first prong of the <u>Boyle</u> test.  The Court
disagreed, finding that the e-mail alone was insufficient to
meet the specifications requirement without further evidence
of actual government involvement in both the performance of
the Subcontract itself and in the decision to remove
Plaintiffs from the VCC.[37/]  First MSJ Order at 34.

In the instant MSJ, JTSI has provided substantial
evidence of the United States's involvement in overseeing
and regulating JTSI's performance under the Subcontract.
The Court finds that there is no longer an issue of material

_____

[37/] Plaintiffs apparently misconstrue the First MSJ Order to
hold that the first prong would never be met on the facts of this
case.  <u>See</u> MSJ Opp. at 10-11.  In fact, the Court was concerned
with the fact that Hayashi's e-mail alone could not sufficiently
be characterized as government specifications without further
evidence of specifications as to JTSI's general performance under
the Subcontract, as well as to the United States's involvement
(other than Hayashi's e-mail) in the decision to remove
Plaintiffs from the VCC.  First MSJ Order at 34-36.  In other
words, questions of fact existed as to the extent of the role
that Hayashi had in overseeing JTSI's performance under the
Subcontract, as well as Hayashi's involvement with the removal of
Plaintiffs outside of the e-mail.

fact that the United States not only approved, but established all on its own, the specifications by which JTSI employees were to perform under the Subcontract.[38/]  Although JTSI provided the personnel,[39/] the United States had the exclusive authority to manage and supervise JTSI's performance of security and technical services under the Subcontract.[40/]  MSJ CSF Ex. S ¶ 6.a.(2).  It was the United States who established all the policies and procedures that JTSI employees were to follow in terms of their actual services under the Subcontract.  MSJ CSF Ex. Q at 37:4-11, 56:17-25, 57:9-12; MSJ CSF Ex. A, Tab 1 ¶ 4.6.

Further, Hayashi himself was the COTR for the Subcontract, meaning that he acted not only as a general supervisor in JTSI's day-to-day performance, but he also had

---

[38/] Plaintiffs have provided no evidence tending to show that JTSI could establish its own procedures for its actual services under the Subcontract.  It is clear that JTSI could create and establish its own internal policies, such as payroll and leave policies.  MSJ CSF Ex. Q at 57:1-8, 13-17.  However, Plaintiffs have failed to show that JTSI could even negotiate with the United States any of the procedures involved in the actual administration of the VCC.

[39/] Even though JTSI provided the personnel, Hayashi testified that he would even do an informal check on new JTSI personnel by sitting down with them and ensuring that they were qualified.  MSJ CSF Ex. Q at 24:9-18.

[40/] Hayashi testified that this authority included the ability to remove contractor employees from working on VCC contracts.  MSJ CSF Ex. Q at 23:20-24:7, 25:2-11.  Plaintiffs have not provided evidence that would tend to show that this authority did not include removing contractor employees.

detailed knowledge of the Subcontract and had the authority to initially require compliance with its provisions.[41/] MSJ CSF Ex. Q at 32:2-8, 21-24, 33:15-21. Because there were a variety of specifications in place as to JTSI's performance, and all of those specifications were created solely by the United States, clearly it was the United States who was effectively "calling the shots." See Hawaii Federal Asbestos Cases, 960 F.2d at 813 ("'[s]tripped to its essentials, the military contractor's defense under Boyle is to claim, "The Government made me do it"'" (quoting In re Joint E. & S. Dist. New York Asbestos Litig., 897 F.2d 626, 632 (2nd Cir. 1990))).

JTSI has also provided sufficient evidence regarding the United States's sole responsibility in the decision to remove Plaintiffs from the VCC. The Court finds

_____

[41/] Plaintiffs argue that JTSI only needed to comply with Hayashi's request once there was official notice provided either by SAIC or the contracting officer. MSJ Opp. at 2. However, as the COTR, Hayashi plainly held the authority to request removal of a JTSI employee from the VCC. In fact, Hayashi had requested the removal of JTSI employees from the VCC in the past. MSJ CSF Ex. Q at 25:12-23, 50:11-13. Of course, JTSI could have refused Hayashi's request, in which case Hayashi would have no choice but to direct official action from either the contracting officer or SAIC. Id. at 33:15-21, 56:6-11. At that point, JTSI would have had to comply or face default. Given those circumstances, it would be an absurd result to penalize JTSI (by removing the government contractor defense) for cooperating with the United States on good terms, while instead requiring them to reject the United States's request until they faced potential default in order for the government contractor defense to apply.

that there is no longer a genuine issue of material fact as
to the United States's independent decision to remove
Plaintiffs from the VCC.  When Hayashi was made aware that,
even after their meeting addressing the very issue on March
29, 2005, Plaintiffs were continuing to report alleged
security violations outside of the chain of command, Hayashi
made the decision to remove Plaintiffs from the VCC.
Hayashi Decl. ¶¶ 18-19.

     Plaintiffs have provided no evidence to show that
JTSI was involved at all in any decision to remove
Plaintiffs.[42/]  In fact, JTSI was not even aware of
Plaintiffs' post-meeting conduct until Hayashi requested
that Jarrett remove them from the VCC.  Keppeler Decl. ¶ 18.
Thus, it is appropriate to "to prevent the contractor
[(JTSI)] from being held liable when the government [(if
there is any fault at all)] is actually at fault."  <u>Trevino</u>,
865 F.2d at 1478; <u>see</u> <u>In re World Trade Center Disaster Site</u>
<u>Litigation</u>, 456 F. Supp. 2d 520, 562 (S.D.N.Y. 2006) ("The
very essence of the defense is to prevent the contractor
from being held liable when the government is actually at
fault, for [w]hen a contractor acts under the authority and
direction of the United States, it shares in the immunity

_____

    [42/] The Court notes that JTSI did make the ultimate decision
to terminate Plaintiffs when, upon removal from the VCC, no other
positions were available.  <u>See</u> MSJ CSF Ex. N at 12.

enjoyed by the Government." (internal quotations and citations omitted)).

The Court finds, therefore, that there is no genuine issue of material fact that the United States alone considered, determined, and directed that Plaintiffs be removed from their positions at the VCC.[43/] Hayashi's request for Plaintiffs' removal, coupled with the evidence of the United States's sole involvement in the decision, as well as the United States's authority to oversee all aspects of JTSI's performance, are reasonably precise specifications established and approved by the United States. Accordingly, given that there is no issue of fact that the United States is solely responsible for the decision to remove Plaintiffs, and because that removal is the subject of this suit, the first prong of the <u>Boyle</u> test is met.[44/] <u>See Correctional</u>

---

[43/] Plaintiffs argue that the reason for Hayashi's request for removal should be a part of the Court's analysis in applying the government contractor defense. MSJ Opp. at 11. However, whether Plaintiffs were removed because of trust issues (as Hayashi claims) or out of retaliation for alleging security violations (as Plaintiffs claim) is irrelevant for the Court's government contractor defense analysis. Instead, the question is simply whether the United States considered and directed the decision, and not JTSI on its own. <u>See Boyle</u>, 487 U.S. at 512.

[44/] This determination is consistent with the First MSJ Order, where the Court found that "the government contractor defense is limited in its application to suits where precise government specifications as to the subject of the contract exist, and those specifications are the subject of the suit." First MSJ Order at 31. In that Order, the Court was concerned with the question of fact as to the connection between Hayashi's

42

Serv. Corp. v. Malesko, 534 U.S. 61, 74 n.6 (2001) (citing

Boyle for the principle that "[w]here the government has

directed a contractor to do the very thing that is the

subject of the claim, we have recognized this as a special

circumstance where the contractor may assert a defense").

───────────────

request for removal and the United States's actual involvement
with regulation of the Subcontract.  The Court was also concerned
that JTSI relied almost exclusively on Hayashi's e-mail as
evidence of the United States's involvement in overseeing both
the Subcontract and the Plaintiffs' removal.  The e-mail on its
own was insufficient to satisfy the first prong of the government
contractor defense.  Thus, the Court noted that "allowing a
request like Mr. Hayashi's to be characterized as a 'reasonably
precise specification' would essentially absolve all government
contractors from liability if they simply provided evidence that
they were in some way acting at the government's instruction."
Id. at 37 n.34.
      However, in the instant MSJ, the evidence provided by JTSI
(and the lack of any evidence by Plaintiffs to counter it) now
shows the connection between the United States's authority over
performance of the contract and the removal of Plaintiffs.
Specifically, Hayashi's e-mail was in fact the last formal step
in the United States's decision to remove Plaintiffs.  Prior to
Hayashi's e-mail, Hayashi, among other things, conducted a
thorough investigation of related complaints, held a meeting with
all VCC personnel including Plaintiffs, and made the decision to
direct Plaintiffs' removal.  Hayashi Decl. ¶¶ 9, 14; MSJ CSF Ex.
Q at 169:20-170:6.  Hayashi then made two separate phone calls to
Jarrett with the sole purpose of directing Jarrett to remove each
Plaintiff individually from the VCC.  See Hayashi Decl. ¶¶ 18-19;
MSJ CSF Ex. P at 54:5-25, 63:14-18.  JTSI played no part in that
decision.  Thus, the Plaintiffs' removal was indeed part of the
larger managing authority that the United States had over JTSI
and the decision to direct such removal was solely made by the
United States.

## 2. JTSI Acted in Conformity with the United States's Specifications.

Having found the first prong met, the Court next addresses the second prong of the <u>Boyle</u> test.[45/] This prong merely requires that the contractor has complied with the reasonably precise specifications established by the United States. <u>Boyle</u> 487 U.S. at 512. The Court finds there is no genuine issue of material fact that JTSI did in fact comply with Hayashi's request to remove Plaintiffs from the VCC. In fact, JTSI's compliance is the reason this suit was filed in the first place. Thus, the second prong of the <u>Boyle</u> test is also satisfied.

## 3. JTSI Should Not be Liable Where the United States is Found to be Immune from Liability.

In addition, the Court finds that the policy considerations underlying the government contractor defense counsel in favor of its application to JTSI here. Within this Order, the Court has determined that sovereign immunity precludes any liability as to the United States pursuant to

---

[45/] The Court need not address the third prong of the <u>Boyle</u> test as it applies only where there are dangers involved with equipment that are known to the contractor. <u>Boyle</u>, 487 U.S. at 512. Here, the Subcontract is not an equipment contract. Further, if there were any dangers involved with the United States's request for Plaintiffs' removal, the United States was more informed about those dangers than JTSI could have been. Therefore, the third prong does not stand in the way of JTSI's government contractor defense.

the discretionary function exception to the FTCA. It is just this type of situation to which the government contractor defense is intended to apply. <u>See</u> <u>Hanford</u>, 534 F.3d at 1000 ("The [government contractor] defense is intended to implement and protect the discretionary function exception of the Federal Tort Claims Act."); <u>Boyle</u>, 487 U.S. at 512 ("It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.").

As part of the analysis to the MTD, the Court also determined that Hayashi had discretion in his decision to remove Plaintiffs. Therefore, it should only follow that a contractor simply complying with that discretionary decision should be able to assert the government contractor defense. <u>Snell</u>, 107 F.3d at 746 ("The rationale [for the government contractor defense] is based not on a simple economic concern for government procurement costs, but on the government's need to exercise judgment.").

Accordingly, the Court grants JTSI's Second Motion for Summary Judgment.[46/] The Court finds there is no genuine

---

[46/] Because the Court finds that application of the government contractor defense preempts any liability against JTSI under state law, it is unnecessary to assess whether the new

issue of material fact that the United States established
and approved reasonably precise specifications as to JTSI's
performance under the Subcontract, specifically with regard
to the Plaintiffs' removal from the VCC.  Further, JTSI
acted, as required, in conformity with those specifications.
Therefore, Plaintiffs' claims against JTSI (Counts I and II)
are precluded by the government contractor defense and JTSI
is entitled to judgment as a matter of law.

### CONCLUSION

For the foregoing reasons, the Court:

(1) GRANTS Defendant United States's Motion to
Dismiss with prejudice as to all claims against the United
States because the discretionary function exception of the
Federal Tort Claims Act applies in this action; and

(2) GRANTS Defendant JTSI's Second Motion for
Summary Judgment as to all claims against JTSI because there
is no genuine issue of material fact that the government
contractor defense shields JTSI from liability.

---

evidence provided by JTSI would affect the Court's determination
on the First MSJ Order as to both the causal connection for
Plaintiffs' HWPA claim and Plaintiffs' state common law claim
pursuant to Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380,
652 P.2d 625, 631 (1982).

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, July 28, 2009.



Alan C. Kay
Sr. United States District Judge

<u>Griffin, et al. v. JTSI, Inc., et al.</u>, Civ. No. 08-00242 ACK-LEK, Order
Granting Defendant United States's Motion to Dismiss and Granting
Defendant JTSI's Second Motion for Summary Judgment.